645 So.2d 829 (1994)
Ricky CHASE
v.
STATE of Mississippi.
No. 90-DP-0515.
Supreme Court of Mississippi.
February 24, 1994.
Rehearing Denied December 8, 1994.
*833 M.A. Bass, Jr., Hazlehurst, James W. Craig, Andre de Gruy, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Jeffrey A. Klingfuss, Sp. Asst. Attys. Gen., Jackson, for appellee.
*834 EN BANC
SMITH, Justice, for the Court:
Ricky Chase was indicted on November 10, 1989, for the murder of Elmer Hart while Chase was engaged in the crime of robbery. He was tried by a jury in the Circuit Court of Copiah County, found guilty of capital murder and sentenced to death.
Chase now appeals and assigns the following as error:
GUILT PHASE
I. THE TRIAL COURT ERRED IN ALLOWING THE STATEMENT OF THE DEFENDANT TO BE ADMITTED INTO EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AS WELL AS ARTICLE THREE, SECTIONS 14 AND 26 OF THE MISSISSIPPI CONSTITUTION.
II. THE STATE INTENTIONALLY STRUCK AFRICAN-AMERICANS AND WOMEN FROM THE JURY IN THIS CASE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND STATE LAW.
III. THE TRIAL COURT ERRED IN EXCUSING JURORS FOR CAUSE IN VIOLATION OF MISSISSIPPI LAW AND THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION.
IV. THE TRIAL COURT ERRED IN EXCUSING JURORS FOLLOWING DISCUSSIONS BETWEEN THE COURT AND PROSPECTIVE JURORS OUTSIDE THE PRESENCE OF THE DEFENDANT.
V. THE COURT'S REFUSAL TO REMOVE A JUROR FOR CAUSE DENIED RICKY CHASE A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF THE CONSTITUTION OF THE UNITED STATES AND THE CONSTITUTION AND LAW OF MISSISSIPPI.
VI. THE TRIAL COURT ERRED IN DENYING INDIVIDUAL SEQUESTERED VOIR DIRE.
VII. THE INACCURATE RESPONSE BY A JUROR TO A DIRECT, UNAMBIGUOUS QUESTION REGARDING HER KNOWLEDGE OF THIS CASE AND UNAMBIGUOUS OPINIONS OF GUILT AND SENTENCE VIOLATED CHASE'S RIGHT PURSUANT STATE LAW, ARTICLE 3, SECTION 14 AND 26 OF THE MISSISSIPPI CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.
VIII. THE IMPERMISSIBLE DISPLAY OF EMOTIONS DURING THE TESTIMONY OF MRS. HART VIOLATED STATE LAW AND DEPRIVED RICKY CHASE OF A FUNDAMENTALLY FAIR TRIAL.
IX. THE ADMISSION OF GRUESOME PHOTOGRAPHS OF THE DECEASED VIOLATED RULE 403 OF THE MISSISSIPPI RULES OF EVIDENCE AND THE STATE AND FEDERAL CONSTITUTIONS.
X. THE ADMISSION OF OTHER CRIMES OR BAD ACTS EVIDENCE VIOLATED CHASE'S RIGHTS PURSUANT TO MISSISSIPPI LAW AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.
XI. THE TRIAL COURT ERRED IN DENYING THE PROPOSED DEFENSE INSTRUCTION IN THE BURDEN OF PROOF AT THE FIRST PHASE OF THE TRIAL.
XII. THE TRIAL COURT ERRED IN DENYING THE PROPOSED DEFENSE INSTRUCTION ON ACCESSORY AFTER THE FACT.
XIII. THE TRIAL COURT'S INSTRUCTION TO THE JURY ON THE MANNER OF ITS DELIBERATIONS WAS UNDULY COERCIVE, IN VIOLATION OF THE STATE AND FEDERAL DUE PROCESS CLAUSES, IN THAT IT FORBADE ANY CONSIDERATION OF THE LESSER INCLUDED OFFENSES UNTIL AND UNLESS THE JURY HAD *835 UNANIMOUSLY AGREED TO ACQUIT CHASE OF THE GREATER CHARGE.
SENTENCING PHASE
XIV. THE EVIDENCE OF CULPABILITY WAS SKEWED IN FAVOR OF THE STATE BY PROSECUTORIAL MISCONDUCT AND TRIAL COURT ERROR.
XV. THE SUBMISSION OF THE AVOIDING ARREST AGGRAVATING CIRCUMSTANCE VIOLATED MISSISSIPPI LAW, ARTICLE III, SECTION 14 AND 26 OF THE MISSISSIPPI CONSTITUTION, AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.
XVI. THE TRIAL COURT ERRED IN ALLOWING THE JURY TO CONSIDER THE "PECUNIARY GAIN" AGGRAVATING CIRCUMSTANCE.
XVII. THE INSTRUCTIONS GIVEN RICKY CHASE'S JURY IMPERMISSIBLY LIMITED THE CONSIDERATION OF MITIGATION EVIDENCE.
XVIII. THE INSTRUCTIONS AT THE SENTENCING PHASE FAILED TO GUIDE THE JURY'S DISCRETION AS REQUIRED BY ARTICLE 3, SECTION 28 OF THE MISSISSIPPI CONSTITUTION AND THE EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES.
XIX. THE AGGREGATE ERROR IN THIS CASE REQUIRES REVERSAL OF THE CONVICTION AND DEATH SENTENCE.
XX. THIS COURT SHOULD FIND THAT THE DEATH PENALTY IS A DISPROPORTIONATE PENALTY HERE WHEN COMPARED WITH OTHER CAPITAL CASES GIVEN THE CIRCUMSTANCES OF THE CRIME AND THE CHARACTER AND HISTORY OF THE DEFENDANT.
Chase has also filed for consideration a supplemental brief in which he reargues issues I, IV, V, XVI and the following issue, which will be discussed with issue XVI:
THE SUBMISSION OF THE "ROBBERY" AGGRAVATING CIRCUMSTANCE AT THE SENTENCING PHASE OF RICKY CHASE'S TRIAL VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE 3 § 28 OF THE CONSTITUTION OF 1890.
Although Chase puts forth many arguments for reversal, the majority of the issues were not initially raised in the lower court or brought to the court's attention by appropriate timely objection. This Court has repeatedly held that "[i]f no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." Cole v. State, 525 So.2d 365, 369 (Miss. 1987), cert. denied 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988); Irving v. State, 498 So.2d 305 (Miss. 1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); Johnson v. State, 477 So.2d 196 (Miss. 1985), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); In re Hill, 460 So.2d 792 (Miss. 1984); Hill v. State, 432 So.2d 427 (Miss. 1983), cert. denied, 464 U.S. 977, 104 S.Ct. 414, 78 L.Ed.2d 352 (1983).
Although the procedural bar is sufficient, this Court also, alternatively, looks to the merits of the underlying claim knowing that any subsequent review will stand on the bar alone. The Fifth Circuit Court of Appeals has addressed this issue in Sawyers v. Collins, 986 F.2d 1493, 1499 (5th Cir.1993), stating: "on application for the writ of habeas corpus, federal courts will not review a state court's holding on a federal law claim-such as Sawyers' Penry claim  if that holding rests upon a state law ground which is both independent of the merits of the federal claim and adequate to support the state court's judgment." See also Harris v. Reed, 489 U.S. 255, 260-63, 109 S.Ct. 1038, 1042-43, 103 L.Ed.2d 308 (1989), wherein, the United States Supreme Court stated:
Consequently, "[w]hen a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." Citing Ylst v. Nunnemaker, 501 *836 U.S. 797, ___, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991) (citing Wainwright v. Sykes, 433 U.S. 72, 87-88, 97 S.Ct. 2497, 2506-07, 53 L.Ed.2d 594 (1977); Murray v. Carrier, 477 U.S. 478, 485-92, 106 S.Ct. 2639, 2643-48, 91 L.Ed.2d 397 (1986).
Furthermore, where a state court finds that a federal claim is procedurally barred, but goes on to reach the merits of that claim in the alternative, the state court's reliance on the procedural default still constitutes an independent and adequate state ground which bars federal habeas review.[1]
Further, the United States Supreme Court in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), stated:
The mere existence of a basis for a state procedural bar does not deprive this Court of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case ...
If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision . ..
An examination of the decision below reveals that it contains no clear or express indication that "separate, adequate, and independent" state-law grounds were the basis for the court's judgment ...
472 U.S. at 327, 105 S.Ct. at 2638, 86 L.Ed.2d at 238.
These assignments, which were not properly presented to the trial court by contemporaneous objection, will be procedurally barred from consideration. We have carefully considered the remaining issues and found them to be without merit. Chase's conviction and sentence will be affirmed.

THE FACTS
On the morning of August 14, 1989, Elmer Hart gathered vegetables and left home to sell them. Hart and his wife Doris lived on Norman Road outside of Hazlehurst. They were both sixty-seven years old and had been married for forty-nine years.
Ricky Chase and Robert Washington were both twenty years old and had known each other since Washington moved to Hazlehurst five or six years earlier.
About 9:30 a.m., Elmer Hart went by the house where Robert Washington lived with his wife and two children. Mr. Hart talked to Terry Washington, Robert's wife. Soon after, Washington left home and stopped by Ricky Chase's house. According to Washington, they started talking about Mr. Hart, and Chase said that Mr. Hart had some money. Chase and Washington talked about going to Mr. Hart's house and "to get some money off of Mr. Hart." They took a bottle of ammonia and left in Washington's Camaro.
Around eleven o'clock, Doris Hart went outside onto the carport and was surprised by a black man, later identified as Washington, who grabbed her and held an ammonia soaked towel over her face. Ricky Chase assisted Washington in tying up and blind-folding Mrs. Hart and carrying her into the house. Mrs. Hart never saw Chase.
Once inside, the two men pulled the phones out of the wall and began ransacking the house looking for valuables. One of the men kept asking "where's the money." During the search the men found some jewelry, a .12 gauge shotgun, a .22 rifle and a .30-.30 rifle. After persistent demands to know where the money was kept, Mrs. Hart finally told the men where her purse was with $400 inside. One of the men found bullets for a .38 pistol and began demanding "where's the .38, where's the .38." Mrs. Hart told him that the gun was in a shoe box beside the bed.
When Elmer Hart returned home, the two men hid in the bathroom. Mrs. Hart managed to yell out to him and he went to his *837 truck and returned with a gun. As Elmer Hart leaned over his wife trying to free her with a pocket knife, Chase stepped out of the bathroom and using the .38 pistol shot Elmer Hart in the head.
Chase then dragged Mrs. Hart out of the room and into a back bedroom. He then pulled Mr. Hart away from the wall, went through his pockets and took Hart's billfold and a roll of money that was in Hart's front pocket.
Chase and Washington grabbed the guns and ran up the road to their car. They successfully wiped out the tire marks but failed to wipe out the strut marks from the Camaro; the police were later able to match the marks. The men went to Washington's house where Washington changed his shoes. From there they went to the Exxon station where Washington went inside to buy beer and cigarettes. Washington said that Chase was afraid to get out at the station because of the blood on his clothes. The station manager agreed that Chase did not get out at the station. Next the men went to Chase's house, where Chase changed clothes and put his jeans, black cap, brown shoes and blue and white shirt into a garbage bag along with Washington's black shoes, black jacket and white gloves. Chase's jeans had blood on them which was found to be the same blood type as Elmer Hart's. Chase's shoes had blood on them which was found to be human but not enough to type. None of the clothing identified as Robert Washington's had any traces of blood of any type.
After leaving Chase's house, they went to Crystal Springs and stopped for fried chicken at a Junior Food Mart. They then went to Willie Minter's house and sold the guns. After one other stop at "the projects" the men went back to Hazlehurst.
While this was going on, Doris Hart managed to free her feet and get into the front yard. Edwin Dodd, the mail carrier, responded to Mrs. Hart's cries for help. Dodd freed Mrs. Hart went inside and found Elmer Hart.
Law enforcement officials began an investigation which quickly lead to the arrest of Chase and Washington. A neighbor was able to identify Washington and his car as being at the scene. Washington and Chase were arrested the same day as the murder. With Chase's help, the authorities were able to recover the murder weapon, the $400 taken from Doris Hart's purse, and $4,000 taken from Elmer Hart. The garbage bag filled with the clothes worn by Chase and Washington and the guns sold to Willie Minter were also recovered.
Both Chase and Washington gave statements to the police in which each accused the other of shooting Mr. Hart. Chase's statement was tape recorded, and he also gave a written statement as to the events of August 14, 1989. Washington plead guilty to capital murder and was sentenced to life in prison.
The three-day trial of Ricky Chase began on February 26, 1990. Robert Washington was the State's chief witness against Chase. The jury found Chase guilty of capital murder and returned a verdict that he should suffer death as penalty for his crime.

DISCUSSION

GUILT PHASE

I.

THE TRIAL COURT ERRED IN ALLOWING THE STATEMENT OF THE DEFENDANT TO BE ADMITTED INTO EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AS WELL AS ARTICLE THREE, SECTIONS 14 AND 26 OF THE MISSISSIPPI CONSTITUTION.
Ricky Chase was interrogated for several hours after his arrest on the evening of August 14, 1989 and gave a statement to the police concerning the events earlier that day. Prior to trial, Chase moved to have this statement suppressed, but the trial court, after a hearing, found that the statement was admissible. Chase argues that his statement was not free and voluntary and was the result of promises and threats.
The general rule is that for a confession to be admissible it must have been given voluntarily, and not as the result of any *838 promises, threats or other inducements. Layne v. State, 542 So.2d 237, 240 (Miss. 1989). The burden is on the prosecution to prove beyond a reasonable doubt that the confession was voluntary. Haymer v. State, 613 So.2d 837, 839 (Miss. 1993); Kirkland v. State, 559 So.2d 1046 (Miss. 1990). The "burden is met and a prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward." Cox v. State, 586 So.2d 761, 763 (Miss. 1991). In Abram v. State, 606 So.2d 1015, 1031 (Miss. 1992), this Court set out the standard of review on voluntariness of confessions:
This point generally presents a fact question which is to be resolved by the trial judge according to the correct legal standards. In making this determination, the trial judge must absolutely resist any inclination to consider whether the confession is truthful or authentic; the focus must be limited to the voluntariness of the confession. Powell [v. State], 540 So.2d [13] at 15 [Miss. 1989]. Once the trial judge has determined the confession to be voluntary, this court will only reverse if convinced that such a finding is manifestly wrong and/or against the overwhelming weight of the evidence, except that our scope of review is less constrained where detailed and specific findings by the trial court are lacking on the critical issue(s). McCarty v. State, 554 So.2d 909, 912 (Miss. 1989); Chisolm, 529 So.2d at 634.
Chase was brought to the Sheriff's office in Hazlehurst around 8:00 p.m. Chief of Police Thomas Quarles advised Chase of his rights. Ralph Fick, a criminal investigator with the Mississippi Highway Patrol, was also present and he confirmed that Chase was read his rights. Chase had no questions about his rights and Quarles did not feel it necessary to go into any more detail. Quarles had known Chase eight to ten years.
After being advised of his rights, Chase denied Chief Quarles permission to search the car Chase had been driving at the time of his arrest. Quarles stated that his purpose in talking with Chase was not to question him about Elmer Hart's murder but to get permission to do the search. Quarles did not ask Chase to waive his rights and was not present during the questioning of Chase, except to walk in and tell him that the owner of the car had been found and asked Chase if he had anything to say before the search of the car began.
Bob Clower, deputy sheriff of Copiah County, and Fick were present when Chase read out loud the rights form and the waiver and then signed a waiver. Fick asked Chase if he understood what he had read and Chase said that he did. This process concluded at 8:25 p.m.
Fick testified that he did not know of any reason why Chase could not have made an intelligent and knowing waiver of his rights. Chase's statement was then recorded and a transcript was made later. The statement concluded at 9:50 p.m.
Fick said that Chase was not abused or mistreated and was not promised any leniency or hope of reward if he talked. According to Fick, Chase did not ask for an attorney or ask not to be questioned any further. Clower was present during the entire time the statement was being taken.
When asked if he or Bob Clower or anyone else told Chase that Robert Washington had "put this case off on him," Fick said, "I did not at the time, I don't think."
Clower confirmed that Chase had been read his rights and that, in Clower's opinion, Chase waived his rights. He also testified that Chase was not mistreated or abused and that Chase was not promised anything if he would make a statement or waive his rights.
Clower also testified that on two subsequent occasions Chase initiated conversations with him in which Chase wanted to show him where Washington had hidden jewelry and money taken from the Harts. On August 15, Chase again contacted Clower and wanted to talk, but Clower was going out on a call. Clower gave Chase a pencil and paper, and Chase wrote down what he wanted to tell Clower. Clower testified that this statement was initiated by Chase without any solicitation.
On cross-examination Clower testified as follows:

*839 Q Isn't it true that y'all told Ricky [Chase] that Robert Washington was laying it all off on him?
A We could have told him that, yes, sir.
Q And it'd be best for him to tell y'all to help himself?
A Yes, sir.
Q So he confessed, he gave this statement, he helped y'all find all this property, not because he understood he was waiving his rights, but because he thought that was the way to help himself in this situation?
A I imagine he might have figured that.
... .
Q And Ricky had become so cooperative because y'all told him he needed to cooperate?
A Yeah, he was cooperating, sure was.
Q Did you tell him if he did cooperate that it would be better for him and help him in the long run?
A All we told him on that was, yeah, it would not hurt him, that anything he could help us get back and all that belonged to them, it could help him.
Later on redirect, Clower testified as follows:
Q Was he at any time promised by you that things would be better for him, and you would be more lenient, if he would make a statement?
A No, sir.
Q Did you ever indicate in any way that if he would talk with you things would be better for him and you would be more lenient if he did not say anything at all?
A No, sir.
At the hearing Chase testified that Quarles read from the rights card only after he had refused to let him search the car. Chase also stated that Clower told him that Robert Washington was blaming it all on him. He said that Clower and Flick told him it would be to his benefit to talk to them. He claimed that he had not signed the waiver prior to some questioning, but prior to the taping of his statement. Chase claimed not to know what "waiver" meant and did "not exactly" understand his rights. Chase used the word waiver himself. However, on cross-examination Chase contradictorily testified that this statement was certainly voluntary because he had signed his waiver of rights away. Chase also contended that he was tape recorded twice. The double taping was denied by Fick on rebuttal.
The lower court overruled the motion to suppress. The court noted that Chase appeared to be above average in intelligence, read quite well and convinced the court that he had an understanding of his constitutional rights. The court concluded that Chase made a knowing, informed waiver of his right to remain silent and right to have an attorney. The court also found no evidence of "force or compulsion, no physical intimidation or threats and no psychological overreach of the free will of the defendant... ."
The issue was again raised during the trial. At the close of the State's case, defense counsel again moved to exclude the statement. The court made a specific finding regarding Clower's testimony:
Insofar as the motion to exclude the statement of Ricky Chase, I do not find that the free will and voluntariness on the part of the defendant was overreached by the actions of the interrogating officers, and the statement that was made I feel was voluntary by the defendant as having been warned as to his constitutional right to remain silent and right against self incrimination, and had been advised as to his Sixth Amendment right of counsel, and that he made a knowing and informed waiver of those rights as required under Miranda versus Arizona. I do not find that the statement by Mr. Bob Clower with reference to the co-defendant having made a statement implicated the defendant Ricky Chase, and caused the statement of Ricky Chase to be involuntary. Therefore, I'm going to overrule the motion to exclude the statement.
Chase argues that the case of Miller v. State, 243 So.2d 558 (Miss. 1971) is "almost identical to the case at bar." In Miller, the sheriff testified that he told Miller "it would be better for him to tell the truth about the *840 thing." Id. at 559. Under the circumstances of that case, this Court concluded that the confession was not voluntarily made and inadmissible.
The circumstances the Court looked at in Miller were the defendant's youth, good reputation, and lack of familiarity with the criminal justice system. Additionally, the Court considered that the confession was made to the sheriff, "the highest officer of the county, a representative of the State, speaking in his official capacity to a youth accused of a crime" Id. Similarly, in Dunn v. State, 547 So.2d 42, 46 (Miss. 1989), this Court found that a defendant who was personally acquainted with the interrogating officer, worked with the officer's wife, and had great confidence and trust in the officer was induced to confess by the officer's statement that he "would do what ever was legal with my realms to help."
Some of the circumstances found in these earlier cases are present in the current case. Some are not. Chase was the same age as Miller, and Chase also had no prior criminal record. Evidence of Chase's good reputation was presented during the sentencing phase but not prior to the suppression hearing or the court ruling on the motion to suppress. Evidence of Chase's intelligence, or lack thereof, was also not before the court. The trial judge knew that Chase had a tenth grade education and that he could read well. There was no evidence presented that Chase was emotionally unstable, and it is unclear whether the trial judge was aware that Chase had attempted suicide while in jail or that this was relevant.
In Willie v. State, 585 So.2d 660, 668 (Miss. 1991), this Court clearly explained, "The determination of whether a statement by an officer to an accused is a mere exhortation or an inducement to confess generally depends on the specific circumstances surrounding the confession." Willie found both Miller and Dunn inapplicable to the facts of that case. Specifically, the Court found that although he was twenty-two, unlike Willie, Dunn had prior experience with the criminal justice system. The Court further found that while Willie knew the sheriff, Willie's acquaintance with the sheriff was more in his official capacity rather than a friendship or personal relationship. The Court found two other circumstances weighing against Willie: his statement was a denial rather than a confession, and no specific promises were made to induce the statement.
The facts of the present case require the conclusion of Willie rather than that of the earlier cases. Clower's comments were exhortations rather than inducement to confess. Although Chase was young, there was no evidence before the court of his good reputation or that he was naive about the criminal justice system. Chief of Police Quarles testified that he knew Chase by "seeing him on the streets, seeing him around his house" and that he "had talked to him some as a deputy sheriff." Significantly, Quarles was not the one who questioned or took the statement from Chase.
Even the most liberal reading of Clower's testimony does not show any specific promise of leniency or reward for making a statement. At the time of the questioning no charges had been made against Chase. Most importantly, Chase's statement was not a confession that he shot Hart; Chase put the blame on Washington.
This Court must address a remaining question: would Chase have given his statement without Clower's telling Chase, "It'd be best for him to tell us to help himself" and that Washington had placed the blame entirely on Chase?
Chase was given Miranda warnings orally on two occasions, and he read aloud a waiver of rights form which he subsequently signed. Chase also wrote out another statement, unsolicited by law enforcement officers, but rather, given at his own insistence. On cross-examination Chase testified:
Q But no one abused you or mistreated you or threatened you or anything like that, did they?
A No one really abused me or threatened me. I was getting some real harsh words, which would scare any man, you know. Nobody wants to be in jail, but physically I wasn't abused. I never told anyone that. No officer abused me.

*841 Q And you had been read your rights at the time you gave a statement?
A Yes, at the time I made my statement  I made several statements.
Q I'm talking about the taped statement.
A Yes, I was. Yes sir.
Q I believe you said you understood those rights and you were able to recite them for us.
A Yes, sir.
Q And when you made that statement it was voluntary, wasn't it?
A Uhh  .
Q You told them what you wanted to tell them?
A I didn't tell them  yes, sir, I did. I told them what I wanted to tell them.
Q And it was voluntary so far as what you told them?
A Yes, sir, it was certainly voluntary because I had signed my waiver of rights away.
Chase was also questioned on cross-examination concerning why he gave statements to the law enforcement officers:
Q And why did you give a statement?
A Why did I give a statement?
Q Yes, sir.
A Because I was told that everything was put on me, and which I know it didn't happen like that. That's why I gave the statement I gave.
Q And if no one had told that to you, you wouldn't have said anything at all?
A If no one had told that to me I would have told it anyway, just as I was at first going to confess to what had happened.
This Court, in Smith v. State, 465 So.2d 999, 1002 (Miss. 1985), held that "the resolution of conflicting testimony regarding voluntariness is a question of fact to be resolved by the trial judge at the suppression hearing." In determining voluntariness, the court must look at the "totality of the circumstances" surrounding the statement. Davis v. State, 551 So.2d 165, 169 (Miss. 1989), cert. denied 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 797 (1990).
Chase received his Miranda warning two times, and read aloud his rights from a waiver form. Chase could read and write very well, and obviously understood his constitutional rights. He refused Chief Quarles permission to search the car he had been driving at the time he was arrested. Subsequently, Chase gave permission for officers to search his own room at his mother's home. Chase's statement placed the blame for everything on Washington. However, Chase admitted to being present during the murder and to being with Washington before and after the commission of the crime. Neither the taped statement nor the written statement was introduced into evidence. However, testimony about the circumstances and facts surrounding Chase's statement was allowed as evidence for whatever weight and credibility the jury might give it.
Chase blamed all events on Washington, maintaining he was a mere observer and only a slight participant. Chase told several different versions of events which caused "wild goose chases" for law enforcement officials before Chase finally "came clean" on some of these events. His stories about where Washington had thrown the murder weapon and where Washington had placed the $400 cash from Mrs. Hart's purse are prime examples of these "chases." Although Chase blamed everything on Washington, the whereabouts of all the money and property taken from the Harts' home was eventually located solely by the assistance of Chase, not Washington. When he gave a statement on August 18, except for the four long guns sold to the "fence" Willie Minter, Washington did not know where any of the stolen property or money was located. Washington did tell officers where to find the plastic garbage bag of clothing he and Chase had worn and subsequently tossed beside a roadway.
Chase's statement was a denial, not a confession. No specific promise was made to Chase by a law enforcement officer. Also, Chase maintained that he would have told the truth anyway regardless of Clower's comments to him.
We hold that from a totality of all the circumstances the lower court was well within the realm of substantial evidence in finding *842 that Chase's statement was admissible and not the product of improper inducement. Chase made an intelligent and knowing waiver of his rights. All law enforcement officers' testimony, as well as Ricky Chase's own testimony, constitutes proof that Chase was advised of his constitutional rights, that he understood those rights, and that regardless of Clower's statement to him, Chase voluntarily and without inducement, gave several statements or admissions to law enforcement officers. More importantly, as Chase put it, "I would have told the truth anyway."
This assignment of error is without merit.

II.

THE STATE INTENTIONALLY STRUCK AFRICAN-AMERICANS AND WOMEN FROM THE JURY IN THIS CASE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND STATE LAW.
The jury selected to hear this case consisted of nine whites and three blacks. Seven of the jurors were females. Of the eight peremptory challenges used by the prosecution, seven were used to strike blacks, and six of the eight challenges were used to strike women from the jury (five of the six were black females). Chase used all twelve of his challenges against whites, eight of whom were also women. Chase is a black male and the victim in the case was a white male.
Chase challenges the prosecution's peremptory challenges under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In each case where a black juror was peremptorily challenged, the prosecution was required by the court to provide a non-racial reason for exercising the challenge. The court accepted the reasons given and allowed the challenges. No objection was raised by Chase to the challenges based on gender and as a consequence that claim is procedurally barred.
Batson sets forth a three-part test for a defendant to make out a prima facie case of purposeful discrimination in jury selection. The defendant must show:
1) that he is a member of a cognizable racial group;
2) that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race;
3) that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.
476 U.S. at 96.
This Court gives "great deference" to the trial court's findings of fact on this issue. Willie v. State, 585 So.2d 660, 672 (Miss. 1991) (citing Bradley v. State, 562 So.2d 1276, 1283 (Miss. 1990)). "As long as the trial court was within its authority when it determined that the State articulated a `neutral, non-race based explanation,' we will not reverse." Willie, 585 So.2d at 672 (quoting Chisolm v. State, 529 So.2d 635, 639 (Miss. 1988)).
While Chase contends that all the challenges against blacks were improper, he focuses on two challenges, those of Linda Johnson and Larry Jones.

A. Linda Johnson

The reason given by the prosecutor for exercising a challenge:
Well, she said she needed to go to the doctor today. She said she's in a brace 
She said she had physical problems, asthma. She might could make it, but, obviously she said she needs to go to the doctor.
[BY THE COURT: Yes, she said she needed to go to a bone and joint doctor today. She's got high blood. Well, all right... .]
During the voir dire the prospective jurors were asked if they were on medication. Linda Johnson told the trial judge:
Yes, I have asthma, sinus and congestion, and I have to take, I have to go to the hospital and have breathing tests ...
I need to go to the doctor right now.
When asked by the judge if she were required to be in court for several days if she thought that it would hurt her health, Linda Johnson said, "No, unless you got a lot of *843 cologne and perfume and stuff. That really hurts me." The judge noted that she had an appointment at the Jackson Bone & Joint Clinic and "seemed very concerned about not being able to make that appointment."
Chase contends that the prosecutor's reason for striking Linda Johnson is suspect because the prosecutor did not also peremptorily strike a prospective white juror, James Walters, with medical problems. Walters stated on voir dire:
I'm James Walters, Your Honor, and I take medication twice a day... .
I could send for it. My wife is home but she doesn't drive.
James Walters was accepted as a juror by the prosecution and then struck peremptorily by Chase.
Linda Johnson's health was of immediate concern to her and could have influenced her ability to function as a juror. She had an appointment with a bone and joint doctor the day of the voir dire and apparently was wearing a brace. Her medical problem had not been resolved to her satisfaction. The white juror, on the other hand, stated only that he was on medication and did not express the same concern or preoccupation that Ms. Johnson did.

B. Larry Jones

The prosecutor explained the strike of Larry Jones as follows:
On voir dire when asked were there any additional questions he stood up and asked would it be the first death sentence ever in the State of Mississippi. I'm not exactly sure what that means, and I would use a peremptory challenge.
Larry Jones, on voir dire, asked the defense, "If he was found guilty of capital murder, wouldn't that be the first death sentence in Mississippi?" When told no, Larry Jones said, "There's been another one?"
In each instance the trial judge accepted the explanation given by the prosecution in exercising its challenge. In neither case did the defense offer rebuttal. In Davis v. State, 551 So.2d 165, 172 (Miss. 1989), this Court held that "the defense may rebut the neutral nonracial explanation for peremptory challenges." The Court went on to say:
In the absence of an actual proffer of evidence concerning this issue, this Court may not reverse on this point. See Jones v. State, 306 So.2d 57, 58 (Miss. 1975); Pennington v. State, 437 So.2d 37, 39 (Miss. 1983). While this Court intends to be sensitive to the possibility that reasons may actually be for racially discriminatory purposes, it is incumbent upon Davis to come forward with proof when given the opportunity for rebuttal.
Id.
The statement of Mr. Jones might indicate that he was uninformed and probably would not make a good juror. The use of the peremptory challenge against him is difficult to comprehend based on only a reading of the transcript. This Court does not have the advantage of observing the prospective juror. The trial judge with the opportunity to observe the prospective juror accepted the explanation by the State, and this Court will give deference to his finding.
In addition to finding each explanation adequate, the trial judge further stated:
This district does not have a history, nor does the State's attorneys in this district, have a history of excluding blacks from the jury. I cannot remember a jury in the last ten years that was not represented by members of the black race as well as members of the white race.
The trial court's findings were neither clearly erroneous nor against the overwhelming weight of the evidence. The record does not support Chase's Batson claim of purposeful racial discrimination in jury selection.
On the question of gender-based discrimination, Chase argues that no genderneutral explanations were offered for peremptory challenges against women. However, no objection was raised by the defense and no such explanation was requested. Chase concedes that the holding in Batson has not been applied to gender discrimination. The bigger problem is that Chase did not raise this issue at trial and allow the prosecutor an opportunity to respond or give the trial judge an opportunity to make a ruling or finding of fact. This failure alone *844 insures that this issue cannot be the basis of reversal. Chase's claim of gender-based discrimination in jury selection is procedurally barred on appeal by our rule requiring contemporaneous objection as a prerequisite to preservation of the issue on appeal.
Alternatively considering this assignment on its merits, Chase also does not make a case for purposeful exclusion of women. The reasons given by the prosecutor for exercising the peremptory challenges on five of the women were not only race neutral, they were also gender neutral. Chase also used seven of his peremptory challenges, more than the prosecution, to exclude women from the jury. Despite the exclusion of women by both sides, the jury panel ultimately consisted of a majority of women. Chase's assignment fails not only for failure to preserve the issue, but also for failure of any supporting proof.
In addition to the other considerations, it should also be pointed out that the prosecutor only used a total of eight peremptory challenges. This considerably weakens any argument by Chase. If the prosecutor were intent on purposeful discrimination based on either race or gender, then the additional challenges could have been used to exclude blacks or women who ultimately served on the jury.
This assignment of error is without merit and procedurally barred, in part.

III.

THE TRIAL COURT ERRED IN EXCUSING JURORS FOR CAUSE IN VIOLATION OF MISSISSIPPI LAW AND THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION.
Chase challenges the exclusion for cause of three jurors, Freddie Jackson, Nellie Tillman, and Dena Hall. Since Chase raised no objection to any of these rulings, his claim is procedurally barred. Without relaxing the bar, this Court also looks to the underlying merits of the claim.

A. Freddie Jackson

The trial court stated that Mrs. Freddie Jackson was excused "because of conscientious scruples against the infliction of the death penalty. Mrs. Freddie Jackson vacillated back and forth, more or less, but she said `I don't think I could vote for the death penalty under the circumstances... .'" No objection was raised by Chase.

B. Nellie Tillman

Chase devotes two short paragraphs to arguing that Ms. Nellie Tillman was improperly excused as a juror. Chase contends that there is nothing in the record to support excusing this juror for cause. The record indicates otherwise.
While neither the prosecutor nor the judge stated why Ms. Tillman was excused, the record shows that Ms. Tillman knew Chase but stated that she believed she could be impartial. Ms. Tillman was a diabetic and had high blood pressure. She had read about the case in the newspaper and heard it on television and, in addition, she worked with Chase's sister-in-law. Ms. Tillman had a ten year old daughter, the child's father worked on the road as a truck driver, and there was nobody to take care of the child. She indicated that this would definitely weigh heavily on her mind.
As the State noted, this Court in Billiot v. State, 454 So.2d 445, 457 (Miss. 1984), stated: "Generally a juror who may be removed on a challenge for cause is one against whom a cause for challenge exists that would likely effect his competency or his impartiality at trial." In this instance, there were several grounds to support the challenge for cause of Ms. Tillman.

C. Dena Hall

Dena Hall was excused pursuant to Miss. Code Ann. § 13-5-1 (1972). This section excludes persons under the age of 21 from jury service. Ms. Hall was nineteen years old. Chase contends that this provision violates the Sixth and Fourteenth Amendments to the United States Constitution and Article 3, §§ 14 and 26 of the Mississippi Constitution.
This Court has previously considered the exclusion of persons under 21 from jury service and has consistently held that the exclusion does not violate the state or federal *845 constitution. Turner v. State, 573 So.2d 657, 666 (Miss. 1990), rev'd on other grounds; Irving v. State, 498 So.2d 305, 319 (Miss. 1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); Fermo v. State, 370 So.2d 930, 934 (Miss. 1979); Joyce v. State, 327 So.2d 255, 261 (Miss. 1976); Johnson v. State, 260 So.2d 436, 437 (Miss. 1972).
This assignment of error is procedurally barred and, alternatively, without merit.

IV.

THE TRIAL COURT ERRED IN EXCUSING JURORS FOLLOWING DISCUSSIONS BETWEEN THE COURT AND PROSPECTIVE JURORS OUTSIDE THE PRESENCE OF THE DEFENDANT.
The court qualified the prospective jurors pursuant to Miss. Code Ann. § 13-5-1 (1972), giving the various reasons which would disqualify a person from serving as a juror. Several prospective jurors asked to approach the bench. After off-the-record discussions between the court and these prospective jurors, two panel members, Robert Pleasant and Margaret Knight, were excused. Presumably, the court found that they were barred by statute from jury service.
Chase argues that this action violated his right to be present during the impaneling of the jury. As has been the case in other assignments of error, there was no objection raised at the time of the alleged error. Chase also failed to object to the jurors prior to the jury being impaneled and indicated to the court that he had no objection to the selection of the jury. Since no objection was made, the issue is not properly preserved for review by this Court.
As noted by the State, another independent basis for rejecting Chase's argument is the failure to preserve an adequate record. In Hansen v. State, 592 So.2d 114, 127 (Miss. 1991), this Court stated: "It is elementary that a party seeking reversal of the judgment of a trial court must present this court with a record adequate to show that an error of reversible proportions has been committed and that the point has been procedurally preserved."
This assignment of error is procedurally barred and without merit.

V.

THE COURT'S REFUSAL TO REMOVE A JUROR FOR CAUSE DENIED RICKY CHASE A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF THE CONSTITUTION OF THE UNITED STATES AND THE CONSTITUTION AND LAW OF MISSISSIPPI.
Chase challenged for cause prospective juror Mary Welch. On voir dire, Ms. Welch had indicated that she had been robbed three times. When asked if it would bother her to sit on the case, she said, "If it was proved that that's what they were doing at the time this happened." When asked if she thought that this would influence her ability to objectively and impartially hear the evidence, Ms. Welch responded, "No." The trial court never ruled on this challenge. Ms. Welch was subsequently accepted by Chase as a juror at a time when Chase had not exhausted his peremptory challenges.
In Shell v. State, 554 So.2d 887, 893 (Miss. 1989), rev'd on other grounds, Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), this Court addressed the same issue:
[T]his Court has held on more than one occasion that when a trial court fails to sustain a challenge for cause by the defense, it must be shown that the defense had exhausted all of its peremptory challenges before the trial court's refusal to allow the challenge for cause. Chisolm v. State, 529 So.2d 635, 639 (Miss. 1988); Johnson v. State, 512 So.2d 1246, 1255 (Miss. 1987).
The rationale behind this rule was set out in Hansen v. State, 592 So.2d at 129-30:
[T]he appellant has the power to cure substantially any error so long as he has remaining unused peremptory challenges. We would put the integrity of the trial process at risk were we to allow a litigant to refrain from using his peremptory challenges and, suffering an adverse verdict at *846 trial, secure reversal on appeal on grounds that the Circuit Court did not do what appellant wholly had power to do.
Chase contends that this situation is comparable to that in Billiot v. State, 454 So.2d 445 (Miss. 1984). The defense sought to excuse jurors in Billiot based on their reluctance to be open minded on the insanity defense. Although this Court determined that a juror's answer that she would "try" to follow the court's instructions was inadequate, there was no reversible error since the juror was excused by peremptory challenge. The Court in Billiot noted that the defense could have requested additional peremptory challenges but did not.
In the case sub judice, Ms. Welch's response that her impartiality and objectivity would not be affected by her experience as a crime victim is not analogous to the inadequate response in Billiot. Chase further failed to use his remaining peremptory challenge or to request additional challenges.
This claim is barred and, alternatively, not supported by the record.

VI.

THE TRIAL COURT ERRED IN DENYING INDIVIDUAL SEQUESTERED VOIR DIRE.
Chase contends that he moved prior to trial to be allowed individual sequestered voir dire based on the extensive publicity surrounding the case. There is no motion or request for individual sequestered voir dire found in the record. The references by Chase to the record are to a motion for additional peremptory challenges and the court's ruling denying this motion. Nowhere is there mention of individual sequestered voir dire. Again, defense counsel raised no objection prior to the impanelling of the jury.
Since Chase never requested individual sequestered voir dire, he is precluded from raising this claim on appeal. A trial court cannot be put in error on a matter not presented to the court for decision. Jones v. State, 606 So.2d 1051, 1058 (Miss. 1992); Crenshaw v. State, 520 So.2d 131, 134-135 (Miss. 1988).
Alternatively, the procedure for conducting voir dire in criminal cases is governed by Rule 5.02, Miss.Unif.Crim.R.Cir.Ct.Prac. (1992), which provides:
In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked.
This Court has held that Rule 5.02 does allow a court, in its discretion, to use individual sequestered voir dire. However, Rule 5.02 does not require more than what its terms require. Russell v. State, 607 So.2d 1107, 1110 (Miss. 1992); Hansen v. State, 592 So.2d 114, 126 (Miss. 1991). The lower court in this case would have been within its discretion to deny individual sequestered voir dire if such a request had been made.
This assignment is procedurally barred and, alternatively, without merit.

VII.

THE INACCURATE RESPONSE BY A JUROR TO A DIRECT, UNAMBIGUOUS QUESTION REGARDING HER KNOWLEDGE OF THIS CASE AND UNAMBIGUOUS OPINIONS OF GUILT AND SENTENCE VIOLATED CHASE'S RIGHT PURSUANT TO STATE LAW, ARTICLE 3, SECTION 14 AND 26 OF THE MISSISSIPPI CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.
Chase contends that Mary Givens refused to answer truthfully regarding her preconceived opinions concerning guilt and sentencing. In response to the question whether anyone had contacted them or discussed the case with them, many of the panel indicated that they had knowledge of the case. Mrs. Givens indicated that she had not heard much about the case. She said, "My husband just came in and said there was a couple murdered, and that was about it." She said she had not formed an opinion on *847 the case. Mrs. Givens was not challenged by either side and was seated on the jury.
After the conclusion of the trial, defense counsel obtained an affidavit from Leslie Riddlehoover Brown, an attorney for the State Tax Commission. In the affidavit, Ms. Brown stated that she heard Mrs. Given's husband state that his wife was a juror in a capital murder case. Mr. Givens was also a Tax Commission employee. The affidavit further stated:
He said the defendant was "going to get fried." I stated that it sounded as though he knew the guy was guilty. He replied that the guy was guilty and then reiterated that the guy was going to fry  his wife was going to make sure of it if she got the chance. He stated to the effect that they had talked about it and that they both knew he was guilty and "she's gonna fry him if she gets the chance."
The trial court heard testimony on this claim during the motion for new trial. Ms. Brown was not cooperative and did not testify. The defense did not subpoena her. Both Mr. and Mrs. Givens testified. Mrs. Givens testified that she had not discussed the case with her husband before the trial and had no contact with him during the trial. When asked if she had any preconceived opinions concerning the death penalty, she said she "came in with a very open mind." She said that she had answered all the questions on voir dire truthfully. Mr. Givens also testified that he had not discussed the case with his wife prior to trial or during trial, and he denied every part of the affidavit.
The court overruled the motion for new trial and found the affidavit "apparently totally without merit."
Odom v. State, 355 So.2d 1381 (Miss. 1978) is the seminal case on a juror's withholding information or misrepresenting material facts on voir dire. Odom holds that the failure to respond to a question does not warrant the lower court granting a new trial unless the court determines:
whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in the selecting of the jury could reasonably be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered. It is, of course, a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong.
Id. at 1383 (footnote omitted).
In the case at bar, defense counsel asked, "Has anyone contacted you about this case or discussed this case with any of you?" As Chase concedes, Mrs. Givens and others indicated they had knowledge of the case. Mrs. Givens stated that her husband told her about the murder, and she stated she had not formed an opinion on the case. Her post-trial testimony did not contradict her answers on voir dire. Neither she nor Mr. Givens gave any indication that any discussion of the case occurred.
In order to get to the Odom inquiries, there must be a failure or refusal by the prospective juror to respond to a question on voir dire. The only evidence supporting this conclusion was found by the court to be without merit. There was no failure or refusal to answer questions on voir dire. Chase suffered no prejudice as a result of Mrs. Givens being impanelled as a juror nor was he denied the opportunity to intelligently exercise his peremptory challenges. There is no indication that the court's judgment was wrong, and there was no error in denying the motion for new trial on this claim.

VIII.

THE IMPERMISSIBLE DISPLAY OF EMOTIONS DURING THE TESTIMONY OF MRS. HART VIOLATED STATE LAW AND DEPRIVED RICKY CHASE OF A FUNDAMENTALLY FAIR TRIAL.
Doris Hart, the widow of Elmer Hart, was a key eyewitness to the murder. *848 Prior to trial, Chase moved to "enjoin victim's family and/or friends from showing emotion in the courtroom while sitting as spectators." The motion was granted.
During the guilt phase, Doris Hart took the witness stand. During direct examination, Mrs. Hart began crying while describing what happened. Family members sitting in the courtroom also began crying. Defense counsel requested a bench conference and relying on his pre-trial motion to enjoin emotional displays, counsel moved for a mistrial. The trial judge overruled the motion and ruled that "it was understandable under the circumstances for Mrs. Hart to be upset and that as far as the display of emotion by family members, the court found that it has no adverse or prejudicial effect on the jury." After a brief recess, Mrs. Hart continued her testimony.
The question of emotional or crying witnesses has been addressed by this Court. In Ladner v. State, 584 So.2d 743 (Miss. 1991), the daughter of the murder victim, who also discovered her mother's body, testified at trial relative to the murder scene and surrounding conditions. On direct examination, she began to weep and the court recessed to allow her time to regain her composure. Ladner contended her emotional outburst was prejudicial and requested a mistrial. The request was denied. This Court held that the "trial judge is in a better position to assess the effect of such an incident than is this Court on appeal, and this Court will not reverse on the failure to grant a mistrial unless the trial judge abused his discretion in overruling the motion for a mistrial." 584 So.2d at 753, citing Horne v. State, 487 So.2d 213, 214-215 (Miss. 1986).
In the capital murder case of Evans v. State, 422 So.2d 737 (Miss. 1982), the victim's brother sobbed, cried and generally was emotional on the witness stand while giving testimony identifying the victim. This Court found that there was no reversible error in the jury hearing and seeing the family member's distress since "the appellant caused the situation and cannot complain, if the evidence has probative value." 422 So.2d at 753.
Mrs. Hart, as a witness to the crime, was a relevant and necessary witness. The need for her testimony outweighed any prejudicial effect caused by her display of emotion and that of other family members. When she began crying, the judge appropriately allowed a short recess for Mrs. Hart and the family to regain their composure. Out of the jury's presence the trial judge ably put it: "It seems rather unfair to kill a woman's husband and then complain because she cries."
There was no abuse of discretion by the court in refusing to grant the mistrial.

IX.

THE ADMISSION OF GRUESOME PHOTOGRAPHS OF THE DECEASED VIOLATED RULE 403 OF THE MISSISSIPPI RULES OF EVIDENCE AND THE STATE AND FEDERAL CONSTITUTIONS.
By pre-trial motion, Chase sought to exclude all photographs of Elmer Hart taken before and after death. The court deferred ruling on the admissibility of the photographs. Without having seen the photographs, the court noted that admissibility would depend on whether "their probative value outweigh[ed] any prejudicial effect."
Chase contends that the court abused its discretion in introducing Exhibits S-2 and S-23 to the jury in both the guilt and sentencing phases of the trial. S-2 shows the body of Elmer Hart as discovered by authorities, and S-23 shows the body from a direct angle. When objection was raised concerning S-2 during the trial, the trial judge found that "the photographs were not unusually gruesome and the probative value would outweigh the prejudicial effect." When S-23 was sought to be introduced, defense counsel responded, "No objection."
Since no objection was presented against S-23, Chase waived any objection to its admissibility and the claim is now procedurally barred. Because the photographs are substantially the same, any argument could be applied to both.
As a general rule, the admissibility of photographs into evidence is within the sound discretion of the trial judge. Hurns v. *849 State, 616 So.2d 313, 319 (Miss. 1993). The trial judge's decision will be upheld on appeal unless an abuse of discretion can be shown. Alexander v. State, 610 So.2d 320, 338 (Miss. 1992); Ladner v. State, 584 So.2d 743, 753-754 (Miss. 1991). No such abuse of discretion can be shown in this case.
The photographs show the position of the body of Elmer Hart lying on the bedroom floor with his pants pockets pulled out. Neither photograph shows the fatal head wound, unusually large amounts of blood or anything approaching gruesomeness. By comparison to most photographs admitted in murder cases, these photographs are relatively mild. Further, these photographs were of significant probative value. Washington testified that after Chase shot Mr. Hart, Chase went through Hart's pockets. There is also evidence of blood splattered on the wall which is important regarding the blood stains found on the blue jeans belonging to Chase recovered from the bag of clothes.
In Williams v. State, 544 So.2d 782 (Miss. 1987) this Court reviewed the admissibility of photographs of the victim's wounds as well as numerous parts of the victim's autopsy. In holding these photographs properly admitted the Court said:
A review of our case law indicates that the discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value. At this point in the development of our case law, no meaningful limits exist in the so-called balance of probative/prejudicial effect of photographs test.
544 So.2d at 785.
The present photographs are nowhere near as gruesome as those in McNeal v. State, 551 So.2d 151 (Miss. 1989), where the Court found the admission of the photographs of the victim's "decomposed, maggot-infested" skull was an abuse of discretion and amounted to reversible error. Also not comparable is the situation in Welch v. State, 566 So.2d 680, 685 (Miss. 1990), in which the Court found that the autopsy photographs of the dissected cadaver "were extremely unpleasant and used in such a way as to be overly prejudicial and inflammatory."
Because the photographs were not gruesome and were highly probative and relevant, there was no abuse of discretion in their admission. Objection to one of the photographs was waived or procedurally barred. Also, this assignment of error is without merit.

X.

THE ADMISSION OF OTHER CRIMES OR BAD ACTS EVIDENCE VIOLATED CHASE'S RIGHTS PURSUANT TO MISSISSIPPI LAW AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.
Chase argues that inferences of other crimes allegedly committed by Chase were improperly introduced at trial. This is again an argument in which no objection was raised in the lower court. The State's argument that the claim is "frivolous" is perhaps an understatement.
The first reference to other crimes was during the cross-examination of Robert Washington. Defense counsel himself brought out this testimony and pursued it. Defense counsel raised no objection and did not ask the trial court to instruct the witness or jury in any manner.
The second instance occurred during the testimony of Deputy Clower. Clower was testifying as to various items recovered with the help of Chase. Clower testified that "Ricky was going to take us and show us where Robert threw out a cash register." This was unrelated to the present case, but Clower said "that was just something he [Chase] said that Robert went in a place of business here in Hazlehurst, and we picked it up on the way back to the Sheriff's Office." The testimony was relevant to show the full story of how police authorities recovered important pieces of evidence. More importantly, the testimony showed criminal activity by Washington, not Chase. Again, there was no objection raised to the testimony.
Chase's third claim is based on Chase's knowledge of Washington's committing prior burglaries. Chase testified that he knew *850 Washington had been involved in some burglaries, but that he had never actually seen Washington commit a burglary. Chase disputed Washington's testimony that Chase was with him on one of the burglaries. The prosecutor, contrary to Chase's argument, did not accuse Chase of an "additional crime  accessory after the fact of burglary." The prosecutor asked, "Well, when he [Washington] says you were with him on one of those [burglaries], that's just not true, is it?" The question seems anything but accusatory. No objection was raised to this line of testimony.
Chase correctly states the rules on evidence of other crimes. This Court has "repeatedly held that the admission of evidence of unrelated crimes is reversible error." Rose v. State, 556 So.2d 728 (Miss. 1990). "As a general rule, the testimony in a criminal trial should be confined to the charge for which an accused is on trial and the prosecution should not be allowed to aid the proof against the accused by showing he committed other offenses." Davis v. State, 431 So.2d 468, 470 (Miss. 1983). The problem is that the testimony in controversy concerned crimes committed by Robert Washington or was testimony elicited by defense counsel. Chase's counsel was apparently trying to show that Washington had a history of criminal behavior and therefore was acting in conformity with his past.
Based on the failure to raise objection, this claim is procedurally barred. Willie v. State, 585 So.2d at 679; Lambert v. State, 574 So.2d 573, 575 (Miss. 1990); Miss.R.Evid. 103(a)(1). Alternatively, considered on its merits, this assignment is not reversible error.

XI.

THE TRIAL COURT ERRED IN DENYING THE PROPOSED DEFENSE INSTRUCTION ON THE BURDEN OF PROOF AT THE FIRST PHASE OF THE TRIAL.
Chase requested jury instruction D-2, a circumstantial evidence instruction. This instruction was refused. The court based its decision on the fact that there was testimony by Chase and accomplice Washington and therefore this was not "a purely circumstantial case."
The proposed jury instruction D-2 reads as follows:
The Court instructs the jury that because this case is based on circumstantial evidence, the burden of proof on the State is greater than the burden to prove the Defendant guilty beyond a reasonable doubt and to a moral certainty. In order to convict in this case, the jury must find the evidence is so completely conclusive as to exclude very [sic] other reasonable hypothesis consistent with innocence.
Chase argues that the instruction contains essential language defining the "beyond a reasonable doubt" standard. Chase's argument that this a proper case for a circumstantial evidence instruction is found in footnote only.
Chase, of course, was not entitled to a circumstantial evidence instruction. Both he and Robert Washington, an accomplice and eyewitness to the murder of Elmer Hart, testified at trial. A circumstantial evidence instruction should be given only when the prosecution can produce neither an eyewitness nor a confession by the defendant. Stringfellow v. State, 595 So.2d 1320, 1322 (Miss. 1992); Ladner v. State, 584 So.2d 743, 750 (Miss. 1991); Clark v. State, 503 So.2d 277, 279 (Miss. 1987); Keys v. State, 478 So.2d 266 (Miss. 1985); Mack v. State, 481 So.2d 793 (Miss. 1985).
Chase does not point out why "reasonable doubt" needs further definition and why he did not submit a separate jury instruction on this point apart from the one on circumstantial evidence. This Court has held that reasonable doubt defines itself and needs no further definition by the court. Barnes v. State, 532 So.2d 1231 (Miss. 1988); Boutwell v. State, 165 Miss. 16, 143 So. 479 (1932).
Instruction D-7, requested by Chase and granted by the court, states as follows:
The Court instructs the Jury that in order for the State to meet its burden of proving the Defendant guilty beyond any reasonable doubt, the State must prove each and every essential element of the offense charged; and that before the Jury *851 may convict, they must be convinced of each and every essential element beyond a reasonable doubt.
There are eight other instructions granted by the court in which the jury is told that "reasonable doubt" is the standard by which they are to consider the case presented against Chase. Any additional language Chase thought necessary to define "beyond a reasonable doubt" could have been included in either D-7 or one of the other instructions.
The concurring opinions cited by Chase do not support Chase's argument. In King v. State, 580 So.2d 1182 (Miss. 1991) and Mack v. State, 481 So.2d 793 (Miss. 1985), Justices Robertson and Banks argue against any distinction between direct and circumstantial evidence. 580 So.2d at 1192-1194 ("no instruction mentioning `circumstantial' or `direct' evidence should ever be granted."); 481 So.2d at 796-797 ("I would have our juries instructed that the law makes no distinction between direct and circumstantial evidence... .")
In Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), cited by Chase, the United States Supreme Court, per curiam, condemned an effort by a Louisiana court to define reasonable doubt, including "reference to `moral certainty' rather than evidentiary certainty... ." 498 U.S. at 41, 111 S.Ct. at 330, 112 L.Ed.2d at 342. In Billiot v. State, 454 So.2d 445, 462 (Miss. 1984) this Court noted that "to a moral certainty" is not the correct burden of proof in a circumstantial evidence case.
There was no error in refusing to grant a circumstantial evidence instruction in this case.

XII.

THE TRIAL COURT ERRED IN DENYING THE PROPOSED DEFENSE INSTRUCTION ON ACCESSORY AFTER THE FACT.
Chase requested and was refused Jury Instruction D-18, an "accessory after the fact" instruction. Chase's only cited support is Gangl v. State, 539 So.2d 132 (Miss. 1989).
In Gangl, this Court stated:
The better rule in cases such as this is that the defendant may request an instruction regarding any offense carrying a lesser punishment if the lesser offense arises out of a nucleus of operative fact common with the factual scenario giving rise to the charge laid in the indictment. See Griffin v. State, 533 So.2d 444, 447-48 (Miss. 1988).
Of course, lesser offense instructions should not be granted indiscriminately, and only where there is an evidentiary basis in the record. Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985); Lee v. State, 469 So.2d 1225, 1230 (Miss. 1985).
Id. at 136.
There is no evidentiary basis for granting an accessory after the fact instruction in the present case. "An accessory after the fact is a person assisting one who has completed the commission of a felony to avoid being apprehended, arrested, convicted, etc." Id. Chase admitted to being at the Harts' home and participating in the robbery and other events which occurred both before and after the murder. His admission made him a principal to the crime and precluded the granting of the instruction.
There is no merit to this assignment of error.

XIII.

THE TRIAL COURT'S INSTRUCTION TO THE JURY ON THE MANNER OF ITS DELIBERATIONS WAS UNDULY COERCIVE, IN VIOLATION OF THE STATE AND FEDERAL DUE PROCESS CLAUSES, IN THAT IT FORBADE ANY CONSIDERATION OF THE LESSER INCLUDED OFFENSES UNTIL AND UNLESS THE JURY HAD UNANIMOUSLY AGREED TO ACQUIT CHASE OF THE GREATER CHARGE.
Chase contended that the trial court erroneously granted First Phase Instruction C-2, because the instruction required the jury to first acquit him of capital murder before consideration of lesser included offenses. Instruction C-2 reads as follows:

*852 If you find that the State has failed to prove any one of the essential elements of the crime of capital murder, you must find the Defendant not guilty of capital murder and you will proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all the essential elements of the lesser crime of murder.
Murder is the willful, felonious killing of a human being with malice aforethought and a deliberate design to effect the death of the person killed.
The crime of murder is distinguished from capital murder by the absence or failure to prove beyond a reasonable doubt that the murder was committed while engaged in the commission of the crime of robbery.
If the evidence warrants it, you may find the Defendant guilty of the crime of murder lesser than the crime of capital murder. However, notwithstanding this right, it is your duty to accept the law as given to you by the Court, and if the facts and the law warrant a conviction of the crime of capital murder, then it is your duty to make such a finding uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty; it is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime.
When asked if there were any objections to the instructions on the guilt phase, defense counsel responded, "None, Your Honor." There was also no reference to this alleged error in post-trial motions. Because Chase did not object to Instruction C-2, he has not preserved this assigned error for appellate review and waived his claim. Willie v. State, 585 So.2d at 680; Rule 5.03, Miss.Unif.Crim. R.Cir.Ct.Prac.
Even without the procedural bar, the assignment has no merit. Instruction C-2 follows Instructions C.20 and C.21 of the Mississippi Model Jury Instructions, 1977. While "nothing in state law requires this instruction" (Chase's brief at 29), there is nothing in state law which prohibits it either.
The specific fault that Chase purportedly finds in the instruction is not clearly developed. He seems to say that the instruction requires the jury to first acquit Chase of capital murder before they may consider any lesser included offense. Under Chase's argument, a hypothetical minority of a jury could be coerced into a decision for capital murder because of an impasse in its deliberations. Such a result is not required or warranted under the jury instructions.
In addition to C-2, defense instruction D-22 also instructed the jury that Chase could be found guilty of the lesser included offenses of either murder or manslaughter. C.P. 311. Nothing in this instruction requires a jury to first acquit Chase of capital murder before considering murder or manslaughter. Instruction C-1 told the jury, in part: "You are not to single out any one instruction alone as stating the law, but you should consider these instructions as a whole." C.P. 287. This same logic is reflected in the holding of this Court that instructions should be read in their entirety to determine if there was error. Anderson v. State, 381 So.2d 1019, 1024 (Miss. 1980). Looking at the instructions as a whole, it cannot be said that there was reversible error in spite of the procedural bar. The procedural bar stands.
There being no error found in the guilt phase of Chase's trial, the conviction of capital murder is affirmed.

SENTENCING PHASE

XIV.

THE EVIDENCE OF CULPABILITY WAS SKEWED IN FAVOR OF THE STATE BY PROSECUTORIAL MISCONDUCT AND TRIAL COURT ERROR.
Under this first assignment of error in the sentencing phase, Chase includes several alleged errors. Chase questions the sufficiency of the evidence to support the jury's finding that Chase killed Elmer Hart. Chase argues that the State resorted to a "varied array of underhanded tactics" to bolster its case due to "scant evidence to support their *853 case." Chase alleges prosecutorial misconduct (misstatement of the law, inflammatory argument, failure to preserve evidence, expression of personal opinion, and bolstering of witnesses) and trial court error in excluding mitigation evidence. As has been the case previously, the majority of the alleged errors were not objected to in the lower court and are now procedurally barred.

A. Enmund Finding.
The jury found that Ricky Chase actually killed Elmer Hart. Chase challenges the sufficiency of the evidence to support the finding necessary for a sentence of death as required under Miss. Code Ann. § 99-19-101(7) and Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).
In reviewing the evidence to support the finding, Chase fails to include the testimony of Robert Washington among the evidence supporting the finding. Chase also does not mention the clothing that Chase was wearing which was splattered with blood. The question of fingerprints and who was or was not wearing gloves is a small part of the evidence before the jury. While there was conflicting testimony, there was more than "scant evidence" supporting the finding.

B. Prosecutorial Misconduct.
In appropriate circumstances, prosecutorial misconduct has been the basis for reversal of a defendant's conviction and sentence. See, e.g., Griffin v. State, 557 So.2d 542, 552-553 (Miss. 1990) (death sentence reversed because of prosecutorial misconduct in commenting on defendant's failure to testify). The prosecutor, indeed any attorney, is required to "act in a fit, dignified, and courteous manner which will not degrade or interfere with the administration of justice." Rule 5.01, Unif.Crim.R.Cir.Ct.
Chase's first complaint is that the prosecutor misstated the law during voir dire. The prosecutor stated that if the jury found "the mitigating factors did not outweigh the aggravating factors ... then you on your oath would be required to return the death penalty." Defense counsel and the court responded as follows:
BY MR. VARAS: Excuse me, Your Honor. I don't think that the law states that they have to do that, even if the aggravating factors outweigh the mitigating factors. They can return life no matter what.
BY THE COURT: Ladies and gentlemen of the jury, you will be instructed as to the law at the proper time and just wait and when you receive the law, that will be the law that you are to apply, the law that you receive from the instructions of the Court.
Although no specific relief was requested, the court immediately took steps to correct the situation. No further relief was requested by the defense. The instruction of the trial judge was adequate to correct any error in the misstatement of the law. "It is presumed that jurors follow the instructions of the court. To presume otherwise would be to render the jury system inoperable." Johnson v. State, 475 So.2d 1136, 1142 (Miss. 1985).
Chase next argues that the prosecutor improperly questioned witnesses concerning Mrs. Hart's condition after the murder and introduced pictures of Mrs. Hart which allegedly lacked relevance. This is characterized by Chase as an "attempt to elicit sympathy for the victim and his family."
Edwin Dodds, the mail carrier who discovered Mrs. Hart tied up and blindfolded in her front yard, was asked to describe her physical condition at that time. Sheriff Tommy Jackson was asked about Mrs. Hart's condition when he arrived at the crime scene. The other two references in the record noted by Chase are to Mrs. Hart's testimony and are not concerning her condition. Clearly, there was no error in allowing witnesses to testify as to what they observed when arriving at the murder site. Chase does not support his argument with any authority. Chase further fails to note that Mrs. Hart was a material witness to the events of August 14 and also a victim of physical abuse by Chase and Washington. There was no objection raised to the testimony or to the photographs of Doris Hart. In fact, defense counsel was asked if there was any objection to admission of the photographs and responded, *854 "No, sir, not to this particular photograph." and "No, sir." Argument on this comes too late and is totally without merit.
Chase next complains about points raised by the prosecutor during closing argument which Chase says are "inflammatory." The prosecutor argued to the jury: "You have to go inside you, you can get past the objective because we have met the burden, but I think that when you search your souls you will see that Mr. Hart, his death demands the ultimate punishment, and that is death." The prosecutor also argued that "if you cannot be safe [in your own home], then you can't be safe anywhere. Mrs. Hart will never, ever return to that home." Again, no objection was raised to any of this argument. In Johnson v. State, 477 So.2d 196, 209-210 (Miss. 1985) this Court addressed the need for objection to closing argument:
We next observe it is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of the trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment... .
(citations omitted).
The legal authority cited by Chase does nothing to support his argument. This was not a case where the prosecution introduced evidence of the character or reputation of the deceased or other evidence outside the aggravating circumstances. See, e.g., Willie v. State, 585 So.2d 660 (Miss. 1991), Stringer v. State, 500 So.2d 928 (Miss. 1986), Wiley v. State 484 So.2d 339 (Miss. 1986), Coleman v. State, 378 So.2d 640 (Miss. 1979). In Williams v. State, 522 So.2d 201, 209 (Miss. 1988), the Court, despite cautioning prosecutors against making such arguments, declined to reverse based on arguments of the prosecution in summation. At issue in Fuselier v. State, 468 So.2d 45, 53 (Miss. 1985), also cited as support by Chase, was the presence of the victim's daughter within the rail throughout the trial, which affords no basis for comparison.
Next, Chase argues that the State failed to preserve physical evidence. Specifically, Chase argues that the State failed to test the gloves purportedly worn by Robert Washington for evidence that he fired the fatal shot. Chase also claims that the State did not adequately examine Elmer Hart's clothing.
Defense counsel asked that the gloves be tested to determine whether they had been worn by the triggerman and was told that this test could not be done due to a previously conducted serological test. There is no mention in the record of testing being requested on Mr. Hart's clothing.
In deciding whether destruction of evidence is a denial of due process, the Court looks to "whether the government agents acted in good faith and in accord with their normal practice or had made a conscious effort to suppress exculpatory evidence." Tolbert v. State, 511 So.2d 1368, 1372 (Miss. 1987), citing California v. Trombetta, 467 U.S. 479, 488 (1984). The testimony was that the testing done on Mr. Hart's clothing was standard and the clothes were returned to the family. In the letter to defense counsel advising him that the specific test he wanted on the gloves was no longer possible, the prosecutor offered full cooperation to have any additional tests performed on other exhibits.
There was no evidence of "bad faith" destruction or suppression of any evidence that might be exculpatory.
Chase also argues that the prosecutor improperly expressed his personal opinion as to the his guilt in voir dire and during closing arguments. Once again, there was no objection raised to any of these statements and any argument is now procedurally barred.
On voir dire, the prosecutor stated: "Two people were involved in this murder, in the *855 death of Mr. Hart. I believe that Ricky Chase was one of them."
In guilt phase closing argument, the prosecutor said: "We know that all of the clothes and shoes that were found that everything, in my mind, proves beyond a reasonable doubt that the clothes belonged to the defendant." In the sentencing phase closing argument, the prosecutor was recorded as saying: "My whole decision, my whole point in being here is because I believe that I have proved to you beyond a reasonable doubt and beyond any doubt, that that man right there, a man that shows absolutely no remorse, is the one that pulled the trigger at a time when an elderly man was on his knees with a pocket knife in his hand trying to cut the bonds that held his wife imprisoned."
The comments by the prosecutor were based on matters in evidence. During closing argument, the prosecutor, as well as defense counsel, may comment on facts in evidence and may draw proper deductions from those facts. Johnson v. State, 416 So.2d 383, 391 (Miss. 1982). In Nixon v. State, 533 So.2d 1078, 1100 (Miss. 1987) this Court warned prosecutors to "refrain from interjecting personal beliefs into presentation of their cases." Hard blows are permissible; foul blows are not. Id. As was the case in Nixon, the comments by the prosecutor in this current case are neither hard nor foul. Even if there had been an objection raised, the comments were within permissible bounds.
Chase's next argument is that the prosecution bolstered the testimony of witnesses and "elicited the evidence concerning the polygraph" taken by Robert Washington. There was no objection to any of this alleged bolstering and the argument is procedurally barred.
The testimony complained of in the redirect examination of Robert Washington is as follows:
Q He asked you about being in a a lineup. What did you say you did after you had been in a lineup?
A Ricky was telling the Sheriff that I was involved in a killing at the roadside park and I didn't know nothing about it, and so I told him I didn't know nothing about it, you know, and he took me to Jackson to take a polygraph test, and so I went and took it, and the man said I passed the test just like that.
Q Where did you take the test?
A In Jackson at the Highway Patrol Office.
Washington's testimony that he had taken a polygraph came during questioning by the prosecution, but his testimony and apparently the polygraph are concerning an unrelated killing of which Washington was accused. This questioning was a follow up on questioning by defense counsel. Asking the additional question of where the testing occurred does not particularly bolster Washington's testimony.
During closing argument the prosecutor stated the following:
I don't believe anyone could question the fact that Mrs. Hart was trying to tell the truth as she remembers it. She is amazingly accurate. When she tells you something, when she tell you she says something, when she tells you she knows something, it is proven without question. She described the man that assaulted her, light skinned, large man. Ricky Chase is a small man, Robert Washington is about 5' 11", 180. He is a large man... .
Mr. Varas made a point that Terry Washington was telling the truth when she contradicted something that Robert said, and I think that Terry Washington told you the truth about everything she knew. I don't think she tried to hold anything back.
As previously discussed, the prosecutor is allowed some leeway in discussion of the evidence in closing argument. Looking at Stringer v. State, 500 So.2d 928, 935-936 (Miss. 1986), this does not amount to improper vouching in this case.

C. Exclusion of Mitigation Evidence
On several occasions Chase's counsel attempted to introduce evidence of the bad character and background of Robert Washington. Objection was raised by the prosecution based on relevancy and sustained by the trial court.
*856 Shirley Norrells, Robert Washington's cousin, testified that Washington used drugs and on the Saturday before the murder he appeared spaced out and did not respond when she spoke to him twice. When defense counsel sought to continue this line of questioning, the prosecutor objected as to its relevancy, and the court sustained the objection. During the sentencing phase, Norrells was asked if she thought Chase was "capable of pulling a trigger on somebody." The question was objected to and the objection sustained by the court.
During the testimony of Henry Puckett, a cellmate of Washington at the Copiah County Detention Center, defense counsel asked, "And how does Robert appear, what is your impression of him?" The objection by the prosecutor was sustained. Defense counsel next asked, "Well, let me ask you this. Is there any other specific act you can refer to about Robert?" Objection by the prosecutor was again sustained. The court told defense counsel that unless the questions went to character or truthfulness the court would sustain the objection.
During the sentencing phase, defense counsel asked Henry Dorsey, a former teacher and coach of Chase and Washington, about any incidents involving Washington that stood out in his mind. When Dorsey started to testify to an altercation between him and Washington, the prosecution objected and the court sustained the objection. Dorsey was also asked if he thought Chase was a murderer. The objection to this question as being improper was sustained.
Lynn Beall, the principal of Hazlehurst Elementary School, was asked if he thought Ricky Chase was capable of shooting somebody. In sustaining the objection, the court told defense counsel that "[w]e are now in a phase where if you wish to offer any evidence of mitigating circumstances, then I will let you offer any evidence as to that."
Defendants should be given broad latitude in introducing mitigating circumstance evidence restricted only by the requirement that the evidence must be relevant. Davis v. State, 512 So.2d 1291, 1293 (Miss. 1987).
Apparently, Chase is confused as to the nature of mitigating evidence. The character of Robert Washington and personal opinion as to Chase's capacity for murder are not the same as evidence of mitigating circumstances. The jury had already determined that Chase had committed murder. There was no relevant evidence excluded. There is no merit to this assigned error.
The arguments under this assignment of error are either procedurally barred, without merit or both.

XV.

THE SUBMISSION OF THE AVOIDING ARREST AGGRAVATING CIRCUMSTANCE VIOLATED MISSISSIPPI LAW, ARTICLE III, SECTION 14 AND 26 OF THE MISSISSIPPI CONSTITUTION, AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.
One of the aggravating factors submitted to and found by the jury was "that the capital murder was committed for the purpose of avoiding or preventing a lawful arrest." Chase did not object to this factor being submitted to the jury. Chase now contends that there was no evidence to justify submission of this aggravating circumstance or to support it and that a limiting instruction should have been given. In oral argument, Chase contended that this aggravator only applies to the murder of law enforcement officers, never to civilians. We hold that the question is not one of whether the victim is or is not a law enforcement officer but whether the facts and circumstances prove that to avoid lawful arrest was a motive in the killing.
The record indicates Chase and Washington met earlier the day of the murder and discussed going over to Elmer Hart's home. They discussed the fact that Mr. Hart sold vegetables and carried sums of money on his person. They discussed going to Harts's "to get some money off of Mr. Hart."
Testimony was that a bottle of ammonia and a towel were carried to the Hart home for use on Elmer Hart "to knock him out." *857 Each defendant claimed the other had used it on Mrs. Hart rather than Mr. Hart. The original intent was to simply rob the Harts of goods and cash money.
The record shows that Chase and Washington carried two pairs of gloves with them to the Harts' home. Washington claimed each wore a pair of these gloves, but Chase claimed Washington had on both pairs. The jury may have inferred that Chase and Washington intended to leave no prints, thus avoiding detection and arrest.
Chase and Washington backed Washington's vehicle onto a wooded road approximately 200 yards from the Harts' home. The car had the words "Cool Dog" in large print across the back glass. On leaving they successfully dusted out the tire prints of the car; although, they neglected to note that a rear portion of the car scraped the ground leaving identifiable marks connecting the car to the murder scene. These facts strongly infer an attempt to avoid arrest or detection.
The evidence showed that Chase and Washington placed an ammonia soaked towel over Doris Hart's face, blindfolded, tied up, and gagged her so that she could not identify them or escape. From these facts, there is a strong inference that the defendants were attempting to avoid arrest or detection.
Chase and Washington sought and found three long guns, a .38 caliber pistol and $400 cash from Mrs. Hart's purse. They could have left, but did not. The original plan had been to get money from Mr. Hart. They hid in the bathroom adjacent to the bedroom where Doris Hart was tied up. They waited and watched for Mr. Hart to return home.
When Mr. Hart returned home, he saw his wife's condition and received some brief warning from her of the robbery. Chase and Washington were both trapped in the bathroom with only one way out; that was through the bedroom where Mr. Hart armed with a double barrel shotgun was located. This is the point at which their plan changed. Mr. Hart dropped the shotgun and was attempting to cut his wife free. Chase and Washington said they heard the gun fall. Chase shot Mr. Hart before he had the chance to see either of them. Since Mr. Hart only had a pocket knife in his hand at that moment, Chase did not have to murder him in order to rob him or escape. Elmer Hart's murder, it could be inferred, was to allow Chase and Washington to escape without being identified or arrested.
Washington testified that Chase wore the blue jeans which were found to contain human blood, type B, the same blood type as Elmer Hart's, according to the crime lab expert who testified at trial. Washington further told the jury that Chase had on the brown shoes which were spotted with blood. Washington testified that Chase would not get out of the car at the service station after the murder because he had blood on him. The service station attendant testified that Chase did not get out of the car when they stopped at the service station and to add air to a tire. From these facts the jury could have inferred that Chase was avoiding arrest and detection.
Chase and Washington removed articles of clothing they had worn during the commission of the murder, placed them in a plastic garbage bag and threw them out in a kudzu patch beside a rural roadway in Copiah County. Again, there is the inference from these facts that they were avoiding arrest and detection.
At trial Chase did not object to the court's instruction on avoiding arrest and did not request or submit a limiting instruction to the court. Also, there was no objection to the submission of this aggravating circumstance.
This Court in Hansen v. State, 592 So.2d 114, 152-53 (Miss. 1991) addressed this issue of avoiding arrest or covering one's tracks, where the Court found, "Hansen next takes issue with the aggravating circumstance found in Miss Code Ann. § 99-19-101(5)(e) (Supp. 1987)." The Court stated:
"The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." It is argued some sort of limiting instruction need be given to narrow this aggravator. In Leatherwood v. State, 435 So.2d 645, 651 (Miss. 1983), we rebuffed this contention, stating:

*858 Each case must be decided on its own peculiar facts. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killings or to `cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.
This Court in Hansen, further stated:
Under this construction the Court properly submits this aggravator to the jury, if evidence existed from which the jury could reasonably infer that concealing the killer's identify, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.
The cases above clearly indicate that the key to resolving this question of avoidance of arrest lies squarely on whether or not evidence existed within the record which would have allowed the jury to make reasonable inferences therefrom that the concealing of Chase's identity, and the covering of his tracks in order to avoid detection, apprehension and arrest, was a substantial reason for killing Elmer Hart. We are convinced that substantial and sufficient evidence does exist to support the giving of the instruction and for the jury's reliance thereupon in its sentence of death for Chase.
Chase's contention that a limiting or defining instruction is necessary has been rejected. In Evans v. Thigpen, 631 F. Supp. 274, 283 (S.D.Miss. 1986), aff'd 809 F.2d 239 (5th Cir.1987) the federal court stated:
With respect to the "arrest avoidance" factor, Petitioner argues that his aggravating circumstance is subject to an overbroad construction and that the trial court's instructions to the jury were not specific enough to inform it of a limiting construction. In Gray v. Lucas, the Fifth Circuit rejected almost identical contentions to those made here. 677 F.2d [1086] at 1109-1110 [(5th Cir.1982)]. It noted that the Mississippi courts had limited the application of the circumstances "to refer to purposefully killing the victim of an underlying felony to avoid or prevent arrest for that felony." So construed, the court observed that this factor was directed to a legitimate state interest and was "not so broad that it comprehends an impermissibly large group of murders." Id. at 1110.
The jury was not unreasonable in inferring from the evidence that the murder was committed to avoid arrest. As the facts clearly indicate, Chase and Washington all along the way sought to avoid being recognized or detected. The murder of Elmer Hart was only one of many attempts to avoid detection and arrest. The trial court properly submitted the aggravating circumstance of "avoiding arrest" to the jury. The issue is barred due to Chase's failure to object. Alternatively on the merits, there is no basis for finding error on this issue.

XVI.

THE TRIAL COURT ERRED IN ALLOWING THE JURY TO CONSIDER THE "PECUNIARY GAIN" AGGRAVATING CIRCUMSTANCE.

THE SUBMISSION OF THE "ROBBERY" AGGRAVATING CIRCUMSTANCE AT THE SENTENCING PHASE OF RICKY CHASE'S TRIAL VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE 3 § 28 OF THE CONSTITUTION OF 1890.
The jury was instructed that they could find "that the capital murder of Elmer Hart was committed while Ricky Chase was engaged in the commission of the crime of robbery" and "that the capital murder was committed for pecuniary gain." The jury found both aggravating circumstances. Chase contends that allowing the jury to consider both of these aggravating circumstances was error of constitutional proportions.
In Willie v. State, 585 So.2d at 680-681, this Court held:
Not only should the two aggravators not be given as separate and independent aggravators when they essentially comprise one, they may not be given. When life is at stake, a jury cannot be allowed the *859 opportunity to doubly weigh the commission of the underlying felony and the motive behind underlying felony as separate aggravators... . This decision is to be prospective and will take effect from this date forward.
Chase conveniently omitted reference to the prospective nature of the decision. Willie was decided on July 24, 1991 after the trial in this cause concluded in February 28, 1990. In Jenkins v. State, 607 So.2d 1171, 1182-1183 (Miss. 1992), this Court reaffirmed its holding in Willie. Jenkins' conviction and sentence were both reversed on others grounds, and any suggestion that Jenkins changed Willie is erroneous. The prohibition of Willie still applies prospectively to those cases tried after that case was decided.
Chase did not raise an argument at trial on this question nor did he object to these aggravating factors. Chase also failed to raise the question in his Motion for Judgment Notwithstanding the Verdict or in the Alternative for New Trial, Motion for a New Trial and Sentencing, or Motion to Set Aside Sentence Notwithstanding the Verdict of the Jury. This claim is procedurally barred.
In Cole v. State, 525 So.2d 365, 369 (Miss. 1987), this Court stated: "If no contemporaneous objection is made, the error, if any, is waived. This rule is not diminished in a capital case." In Williams v. State, 445 So.2d 798, 810 (Miss. 1984), the Court recognized its prerogative of "relaxing our contemporaneous objection and plain error rules when the interest of justice so requires." Further, in Pinkney v. State, 538 So.2d 329, 338 (Miss. 1988), the Court said:
Because the death penalty is a different sort of punishment with more severe consequences than other sentences, this Court's scrutiny of such cases is correspondingly heightened. However, there are many instances in which this Court has invoked procedural bars against capital defendants ... In capital cases, the procedural bar is sometimes relaxed because of the nature of the right asserted. Also, this Court has relaxed its procedural bar to consider serious, cumulative errors. Even in capital cases procedural bars appear to be applied, based on a number of factors, on a case by case basis. [citations omitted]
In the present case, the right Chase asserts is the right not to have the two aggravators given to the jury. There is no need to relax the procedural bar and the bar independently is basis for rejecting this assignment. As will be discussed later, there is no evidence of serious, cumulative error which would strengthen this argument. This assignment of error is rejected.

XVII.

THE INSTRUCTIONS GIVEN RICKY CHASE'S JURY IMPERMISSIBLY LIMITED THE CONSIDERATION OF MITIGATION EVIDENCE.
In this assignment of error, Chase complains of the granting of jury instructions which he contends limited mitigation evidence. Chase did not object to the granting of these instructions or raise this issue at trial. This issue is procedurally barred.
The court instructed the jury in Jury Instruction D-38 as follows:
The Court instructs the jury that a mitigating circumstance does not have to be proved beyond a reasonable doubt to exist. You must find that a mitigating circumstance exists if there is any substantial evidence to support it.
Chase contends that the jury should not be limited to "substantial evidence," but Chase was the party submitting this instruction. His complaint should not be considered.
The other complaint concerns Instruction S-1. Chase wrongly argues that this instruction requires unanimity among the jurors on mitigating circumstances. Chase states that seven times during the instruction the jury was told it must make unanimous findings or unanimously agree. These refer to the Enmund finding, the aggravating circumstances, and the sentence of death. None remotely refers to mitigating circumstances.
Chase also argues that when given the examples in mitigation and told that they could consider "any other circumstance *860 brought to you during the trial of this cause which you, the Jury, deem to be mitigating on behalf of the defendant," the jury would conclude that the mitigating factors also must be unanimously agreed on by the jury. This interpretation does not follow from the language in the instruction and there is not "a reasonable likelihood" that the jury will make this interpretation.
As the State notes, a similar argument was addressed in Hansen v. State, 592 So.2d 114, 150 (Miss. 1991). The Court recognized that the instruction did not violate the holding in McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) and McNeil v. North Carolina, 494 U.S. 1050, 110 S.Ct. 1516, 108 L.Ed.2d 756 (1990) or Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). The Court also noted that similar arguments had been addressed and rejected in Turner v. State, 573 So.2d 657, 668 (Miss. 1990); Ladner v. State, 584 So.2d at 760; Willie v. State, 585 So.2d at 681 and Shell v. State, 554 So.2d at 905. The Hansen Court concluded:
In Shell the words "unanimous" or "unanimously" did not appear in the mitigating circumstances portion of the jury instructions but instead were found only in the aggravating circumstances portion. We held the instructions did not offend Mills' prohibitory injunction and that Mills contained no affirmative one.
Such is the case now before this Court. The mitigating circumstances portion of the instruction does not contain "unanimous" or "unanimously." Only the aggravating circumstance part contains these words. No instruction says, implies or intimates to any reasonably literate juror that he or she should await unanimity before considering a mitigating circumstance.
592 So.2d at 150.
There is no merit to Chase's claims even despite a failure to timely object. This claim is procedurally barred.

XVIII.

THE INSTRUCTIONS AT THE SENTENCING PHASE FAILED TO GUIDE THE JURY'S DISCRETION AS REQUIRED BY ARTICLE 3, SECTION 28 OF THE MISSISSIPPI CONSTITUTION AND THE EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES.
Chase contends that Instruction S-1 is flawed in that it shifts to the defense the burden of proving that the mitigating circumstances outweighed the aggravating circumstances. Additionally, Chase asserts that a defendant should go into the sentencing phase with a presumption that life is the appropriate punishment. Chase also argues that the jury should have been instructed that a life sentence must be presumed to be a life sentence without possibility of parole. As noted previously, Chase did not object to Instruction S-1.
Contrary to Chase's argument, Instruction S-1 does not instruct the jury "that the defense bore the burden of proving" anything. Chase's argument on shifting the burden of proof and also on the presumption of life has been addressed by this Court previously. In Shell v. State, 554 So.2d at 904, the Court stated:
This same issue was decided by this Court in Jordan v. State, 365 So.2d 1198 (Miss. 1978):
Essentially Jordan contends that "the guidelines of Jackson appear to require the Defendant to shoulder the burden of proof on mitigating circumstances versus aggravating circumstances." Jackson simply holds, however, that one on trial for the charge involved here must be given an opportunity to present any "circumstances or combination of circumstances surrounding his life and character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death" or life imprisonment.
365 So.2d at 1206
In Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982), the Fifth Circuit considered Mississippi's death penalty statute, and concluded the following:
Every mandatory element of proof is assigned to the prosecution. Neither *861 the burden of production nor the burden of proof ever shifts to the defendant.

Id. at 1105-06. See, also, Stringer v. State, 500 So.2d 928, 944 (Miss. 1986).
Shell also contends that under the instructions given, death, not life, is presumed to be the proper sentence. This issue was disposed of in Leatherwood v. State, 435 So.2d 645 (Miss. 1983), where this Court held that while one found guilty of capital murder occurring during a robbery becomes subject to the death penalty, this penalty is not automatic.
The appellant's argument that he enters into the sentencing phase of the bifurcated trial with one strike against him is correct in one sense  i.e., if he had not been convicted of a capital offense, there would be not need for the sentencing hearing and he would simply be sentenced to serve a life term. This does not mean though that the procedure is unfair or faulty.
435 So.2d at 650.
Shell's reliance on Jackson v. Dugger, 837 F.2d 1469, 1473 (11th Cir.1988) is improper. In Jackson, the jury was instructed that death was the appropriate penalty. In the case sub judice, there was no such instruction. Therefore, there was no presumption that death was the proper sentence. (emphasis in original).
The other issue raised by Chase concerns a jury instruction offered and refused by the court. This proposed instruction reads:
I instruct you that if it is your sentence that the defendant should suffer execution, such a sentence will result in his death. If it is your sentence that the defendant should be sentenced to life imprisonment, he will spend the rest of his natural life in prison.
This argument has been raised in other cases and found to be without merit. See Shell v. State, 554 So.2d at 904; Wilcher v. State, 455 So.2d at 737; Johnson v. State, 416 So.2d at 390-391; Bullock v. State, 391 So.2d at 610. The proposed instruction was an erroneous statement of the law and would have mislead the jury. Chase was not indicted as an habitual offender, and a life sentence would not have been without parole. The trial court correctly refused this instruction.
Chase's claim is procedurally barred, in part. There is also no merit to any of the errors assigned.

XIX.

THE AGGREGATE ERROR IN THIS CASE REQUIRES REVERSAL OF THE CONVICTION AND DEATH SENTENCE.
Chase raises no new issues but rather argues that the aggregate effect of the variety of errors previously assigned combine to make reversible error. As discussed above, there have been no errors assigned that could accumulate thereby necessitating reversal. Under this assignment Chase does not provide a list of the errors or suggest "near errors" of the variety which this Court has previously found to have denied a defendant a fundamentally fair trial. See Stringer v. State, 500 So.2d at 946. Even if there was error, it was at most "harmless beyond a reasonable doubt." See Hansen v. State, 592 So.2d at 153.
There is no merit to this argument.

XX.

THIS COURT SHOULD FIND THAT THE DEATH PENALTY IS A DISPROPORTIONATE PENALTY HERE WHEN COMPARED WITH OTHER CAPITAL CASES GIVEN THE CIRCUMSTANCES OF THE CRIME AND THE CHARACTER AND HISTORY OF THE DEFENDANT.
In accordance with Miss. Code Ann. § 99-19-105(3)(c), this Court must review the record in this case and compare it with the other capital murder cases in which this Court has entered judgment since Jackson v. State, 337 So.2d 1242 (Miss. 1976).
Chase argues that the death penalty is disproportionate because there is no evidence that Chase was the triggerman. Chase cites Reddix v. State, 547 So.2d 792 (Miss. 1989) and Bullock v. State, 525 So.2d 764 (Miss. 1987) as support. In Reddix and Bullock the *862 defendant was not the actual killer and his accomplice had received a life sentence. These cases have no application here.
Chase continues to argue here that the jury finding that he was the actual killer is unsupported by the evidence. Chase does not give credit to the testimony of Robert Washington or the testimony of Doris Hart which tended to corroborate Washington's testimony. There was also the physical evidence of Chase's bloodstained clothing which supports the jury finding. This factual issue was resolved by the jury against Chase. Similarly, Chase's argument that two of the three aggravators were not supported by evidence is a factual issue resolved against him and which is outside the scope of proportionality review.
In Coleman v. State, 378 So.2d 640 (Miss. 1979), cited by Chase, the sixteen year old Coleman shot and killed Mr. Burkett only after being shot at by Mr. Burkett. Coleman had the opportunity to shoot Mrs. Burkett, who was an eyewitness, but he did not. This Court set aside the death penalty and imposed a life sentence instead. Chase shot Mr. Hart while Hart was leaning over his wife trying to cut her loose and while Hart was not a physical threat to Chase. Although Chase did not shoot Mrs. Hart, she was not in a position to identify him. Any comparison to Coleman does not stand up under scrutiny.
The sentence of death in this case was not the result of passion, prejudice, or any other arbitrary factor. The finding of the jury of the aggravating factors is supported by the record. Chase was freely permitted to present to the jury any evidence in mitigation. The imposition of the death penalty will be allowed to stand upon review.

CONCLUSION
The conviction of capital murder and sentence of death imposed on Ricky Chase are supported by substantial evidence. A review of the assignments of error raised by Chase does not indicate any basis for reversal. The conviction and sentence of death are affirmed.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. WEDNESDAY, APRIL 13, 1994, SET AS DATE FOR EXECUTION OF SENTENCE IN THE MANNER PROVIDED BY LAW.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and PITTMAN, McRAE and JAMES L. ROBERTS, Jr., JJ., concur.
BANKS, J., dissents with separate written opinion joined by SULLIVAN, J.

APPENDIX

DEATH CASES AFFIRMED BY THIS COURT

Hansen v. State, 592 So.2d 114 (Miss. 1991).

[*]Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State, 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.

Davis v. State, 551 So.2d 165 (Miss. 1989).

Minnick v. State, 551 So.2d 77 (Miss. 1989).

[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.

[*]Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.

Woodward v. State, 533 So.2d 418 (Miss. 1988).

Nixon v. State, 533 So.2d 1078 (Miss. 1987).

Cole v. State, 525 So.2d 365 (Miss. 1987).

Lockett v. State, 517 So.2d 1346 (Miss. 1987).

Lockett v. State, 517 So.2d 1317 (Miss. 1987).

*863 Faraga v. State, 514 So.2d 295 (Miss. 1987).

[*]Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.

Wiley v. State, 484 So.2d 339 (Miss. 1986).

Johnson v. State, 477 So.2d 196 (Miss. 1985).

Gray v. State, 472 So.2d 409 (Miss. 1985).

Cabello v. State, 471 So.2d 332 (Miss. 1985).

Jordan v. State, 464 So.2d 475 (Miss. 1985).

Wilcher v. State, 455 So.2d 727 (Miss. 1984).

Billiot v. State, 454 So.2d 445 (Miss. 1984).

Stringer v. State, 454 So.2d 468 (Miss. 1984).

Dufour v. State, 453 So.2d 337 (Miss. 1984).

Neal v. State, 451 So.2d 743 (Miss. 1984).

Booker v. State, 449 So.2d 209 (Miss. 1984).

Wilcher v. State, 448 So.2d 927 (Miss. 1984).

Caldwell v. State, 443 So.2d 806 (Miss. 1983).

Irving v. State, 441 So.2d 846 (Miss. 1983).

Tokman v. State, 435 So.2d 664 (Miss. 1983).

Leatherwood v. State, 435 So.2d 645 (Miss. 1983).

Hill v. State, 432 So.2d 427 (Miss. 1983).

Pruett v. State, 431 So.2d 1101 (Miss. 1983).

Gilliard v. State, 428 So.2d 576 (Miss. 1983).

Evans v. State, 422 So.2d 737 (Miss. 1982).

King v. State, 421 So.2d 1009 (Miss. 1982).

Wheat v. State, 420 So.2d 229 (Miss. 1982).

Smith v. State, 419 So.2d 563 (Miss. 1982).

Johnson v. State, 416 So.2d 383 (Miss. 1982).

Edwards v. State, 413 So.2d 1007 (Miss. 1982).

Bullock v. State, 391 So.2d 601 (Miss. 1980).

Reddix v. State, 381 So.2d 999 (Miss. 1980).

Jones v. State, 381 So.2d 983 (Miss. 1980).

Culberson v. State, 379 So.2d 499 (Miss. 1979).

Gray v. State, 375 So.2d 994 (Miss. 1979).

Jordan v. State, 365 So.2d 1198 (Miss. 1978).

Voyles v. State, 362 So.2d 1236 (Miss. 1978).

Irving v. State, 361 So.2d 1360 (Miss. 1978).

Washington v. State, 361 So.2d 61 (Miss. 1978).

Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE

Butler v. State, 608 So.2d 314 (Miss. 1992).

Jenkins v. State, 607 So.2d 1171 (Miss. 1992).

Abram v. State, 606 So.2d 1015 (Miss. 1992).

Balfour v. State, 598 So.2d 731 (Miss. 1992).

Griffin v. State, 557 So.2d 542 (Miss. 1990).

Bevill v. State, 556 So.2d 699 (Miss. 1990).

West v. State, 553 So.2d 8 (Miss. 1989).

Leatherwood v. State, 548 So.2d 389 (Miss. 1989).

Mease v. State, 539 So.2d 1324 (Miss. 1989).

Houston v. State, 531 So.2d 598 (Miss. 1988).

West v. State, 519 So.2d 418 (Miss. 1988).

Davis v. State, 512 So.2d 1291 (Miss. 1987).

Williamson v. State, 512 So.2d 868 (Miss. 1987).

Foster v. State, 508 So.2d 1111 (Miss. 1987).

Smith v. State, 499 So.2d 750 (Miss. 1986).

West v. State, 485 So.2d 681 (Miss. 1985).

Fisher v. State, 481 So.2d 203 (Miss. 1985).

Johnson v. State, 476 So.2d 1195 (Miss. 1985).

Fuselier v. State, 468 So.2d 45 (Miss. 1985).

West v. State, 463 So.2d 1048 (Miss. 1985).

Jones v. State, 461 So.2d 686 (Miss. 1984).

Moffett v. State, 456 So.2d 714 (Miss. 1984).

Lanier v. State, 450 So.2d 69 (Miss. 1984).

Laney v. State, 421 So.2d 1216 (Miss. 1982).

*864 DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT

Reddix v. State, 547 So.2d 792 (Miss. 1989).

Wheeler v. State, 536 So.2d 1341 (Miss. 1988).

White v. State, 532 So.2d 1207 (Miss. 1988).

Bullock v. State, 525 So.2d 764 (Miss. 1987).

Edwards v. State, 441 So.2d 84 (Miss. 1983).

Dycus v. State, 440 So.2d 246 (Miss. 1983).

Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY

[*]Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.

[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.

[*]Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.

[*]Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.

Russell v. State, 607 So.2d 1107 (Miss. 1992).

Holland v. State, 587 So.2d 848 (Miss. 1991).

Willie v. State, 585 So.2d 660 (Miss. 1991).

Ladner v. State, 584 So.2d 743 (Miss. 1991).

Mackbee v. State, 575 So.2d 16 (Miss. 1990).

Berry v. State, 575 So.2d 1 (Miss. 1990).

Turner v. State, 573 So.2d 657 (Miss. 1990).

State v. Tokman, 564 So.2d 1339 (Miss. 1990).

Johnson v. State, 547 So.2d 59 (Miss. 1989).

Williams v. State, 544 So.2d 782 (Miss. 1989).

Lanier v. State, 533 So.2d 473 (Miss. 1988).

Stringer v. State, 500 So.2d 928 (Miss. 1986).

Pinkton v. State, 481 So.2d 306 (Miss. 1985).

Mhoon v. State, 464 So.2d 77 (Miss. 1985).

Cannaday v. State, 455 So.2d 713 (Miss. 1984).

Wiley v. State, 449 So.2d 756 (Miss. 1984).

Williams v. State, 445 So.2d 798 (Miss. 1984).
BANKS, Justice, dissenting:
I cannot accept the conclusion reached by the majority that Chase knowingly and freely gave statements to the law enforcement officers. Accordingly, I dissent.

I
The majority relies upon Chase's testimony at trial and concludes that Chase's confession was knowingly and freely given, since Chase stated at trial that he "would have told the truth anyway." The fact is that this testimony was given in an effort to explain the statements after the trial court had ruled repeatedly that they, and more importantly, their fruit were admissible. What Chase said was worthless as a prosecutorial tool, except the general admission that he was involved. What he led the prosecution to, however, was crucial, and it is clear that inducements which we have historically found impermissible were brought to bear to produce this self-incrimination.
Deputy Clower testified clearly that Chase did not talk until after he was threatened with the electric chair and told that what he *865 said would not hurt him, and it could help him. During the State's case-in-chief, Deputy Clower stated on direct examination that
Well, at first Ricky wasn't going to tell us nothing. He didn't know why the Hazlehurst PD had picked him up. I told Ricky, I said, `look Robert's done told on you, Man, you in a lot of trouble. You going to get the electric chair.' Well, I hadn't even talked to Robert, but, he said `what you mean,' and I said `you know what I'm talking about,' and he said `okay, I'll tell you,' and then that's when he started giving us a statement. After we got through with the statement and all he started taking us and showing us where the stuff was.
In Davis v. State, 406 So.2d 795 (Miss. 1981), we addressed a factual situation similar to the one in the instant case. In Davis, the state's witnesses included deputies and the sheriff who testified on the motion to suppress that no threats, coercion, or promises of reward were made to the defendant. Id. at 799. The trial judge admitted the confessions after finding that the statements were voluntarily made. Id. After the suppression hearing and during the cross-examination by the defense counsel, the deputy stated that he told the defendant "that it would be better for him to cooperate" and "it would be lighter for him." Id. However, because the defense waited until the jury returned a guilty verdict before he objected, we found that the defendant waived the objection. Id. In explaining that the accused waived a definite right that he once had to object, then Justice Hawkins stated, "[o]rdinarily, any statement made by a law enforcement officer to an accused, as was made in this case, that it would be better for him to cooperate and `it would be lighter for him,' would taint the admission or confession and render it totally incompetent. Citation of authority is unnecessary to this well-settled proposition of law." Id. at 803 (Hawkins, J. dissenting on other grounds).
Although the facts of the instant case and Davis are similar, Davis is distinguishable. In the instant case, the testimony was presented in the State's case-in-chief, the defense objected during the trial, and moved to suppress Chase's statements of confession.
During the hearing on the motion, the trial court stated, "Well, he shouldn't have said it. He should be instructed and told that officers should never do that. That's just something the United States Supreme Court has frowned on and reversed cases over and over and over, and law enforcement officers all ought to know that." Nonetheless, the trial court found that the free will and voluntariness on the part of Chase was not overreached. This finding was manifestly wrong. The statements acknowledged by the law enforcement officers during the suppression hearing, along with the statements acknowledged on direct examination, reviewed in conjunction with Chase's statements are compelling evidence supporting Chase's argument that his confession was not freely and voluntarily given.
The majority fails to understand that Chase's testimony at the trial would not have been given had the confession and the evidence to which it led had been suppressed. Abram and its progeny require us to review the evidence presented at the suppression hearing to ensure that Chase received a reliable determination that his confession was, in fact, voluntarily given.
The State has the burden of proving the voluntariness (and consequent admissibility) of the confession beyond a reasonable doubt. Abram v. State, 606 So.2d 1015, 1031 (Miss. 1992). See Haymer v. State, 613 So.2d 837, 839 (Miss. 1993); Kirkland v. State, 559 So.2d 1046 (Miss. 1990). In Agee v. State, 185 So.2d 671 (Miss. 1966), we explained the procedure that the State must follow to meet this burden of proof. We stated:
When, after the state has made out a prima facie case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of such witness.
Agee, 185 So.2d at 673.
On the motion to suppress in the instant case, the State attempted to prove a prima *866 facie case of voluntariness through the direct examination of its law enforcement officers. The officers testified that no threats, coercion, or promise of reward were made to Chase. See ante at 838-840. However, on cross-examination, the State's own witness, Deputy Clover, testified unequivocally that Chase's confession was made after he told Chase "It'd be best for him to tell us to help himself". Deputy Clover agreed that Chase "confessed, he gave this statement, he helped ... find all this property, not because he understood he was waiving his rights, but because he thought that was the way to help himself in this situation." ante at 839. The burden was then on the State to rebut its own witness's testimony. The State failed to do so. Therefore, the trial court erred when it found that Chase's confession was freely and voluntarily given.
As we said in Miller, "Although the statement made by the sheriff that the appellant would be better off by telling the truth was probably not intended as an inducement, yet, when it is considered under the circumstances in which it was made, we conclude it very probable that the statement caused the appellant to confess." Miller, 243 So.2d at 559. Furthermore, "[w]e have repeatedly condemned the practice whereby law enforcement interrogators, or related third parties, convey to suspects the impression, however slight, that cooperation by the suspect might be of some benefit." Abram v. State, 606 So.2d 1015, 1031 (Miss. 1992) (emphasis added) citing Dunn v. State, 547 So.2d 42 (Miss. 1989); Layne v. State, 542 So.2d 237, 240 (Miss. 1989); Agee v. State, 185 So.2d 671, 674 (Miss. 1966).
For the foregoing reasons, I would find that the confession was inadmissible and reverse and remand for a new trial.

II
As to the remaining issues put by this appeal, I agree with the majority result as to the guilt phase, but I note with respect to the court's excusing jurors outside the presence of the defendant and refusal to excuse a particular juror for cause as to the guilt phase that my concurrence is only because of the procedural bar. As to the sentencing phase, I believe that there was insufficient evidence to support submission of the "avoiding arrest" aggravating circumstance to the jury. I would, therefore, reverse as to the penalty.

III
For the foregoing reasons, I respectfully dissent.
SULLIVAN, J., joins this dissent.
NOTES
[1] The Court noted in Harris: "A state court remains free ... to rely on a state procedural bar and thereby to foreclose federal habeas review ... Moreover, a state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." Harris, 489 U.S. at 264 and n. 10, 109 S.Ct. at 1044 and n. 10.
[*] Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.