798 So.2d 417 (2001)
In the Interest of D.O. and T.O., Minors.
No. 1999-CA-02120-SCT.
Supreme Court of Mississippi.
March 15, 2001.
David P. Oliver, Gulfport, Attorney for Appellants.
Herbert Wayne Wilson, Wade M. Baine, Gulfport, Attorneys for Appellee.
Before PITTMAN, C.J., COBB and DIAZ, JJ.
*418 DIAZ, J., for the Court:
¶ 1. On August 24, 1999, the Harrison County Youth Court, Judge Michael H. Ward presiding, upon a recommendation made by the "intake unit" of the Department of Human Services (DHS), ordered an abuse and neglect petition filed on behalf of T.O. and her younger brother D.O., II, whose father and mother are D.O. and J.O., respectively. The petition alleged that the father, D.O., sexually abused his daughter, T.O., and that D.O., II, was neglected due to the fact that he resided in the same home in which T.O. suffered the abuse.[1] Three separate shelter hearings were held regarding this matter, with the lower court issuing rulings on each. During a later hearing, the court appointed Dr. Horrell Townsend to examine T.O. for signs of sexual abuse. After a plea hearing, the case was set for trial.
¶ 2. On October 26, 1999, trial commenced and upon hearing the testimony and evidence presented, Judge Ward took the matter under advisement. On November 9, 1999, Judge Ward adjudicated the children as abused and neglected as described in the petitions. At a subsequent hearing on December 13, 1999, the lower court also found aggravating circumstances to exist, thus holding that reasonable efforts toward reuniting the children with their parents by the State were not required. Two days later, the trial judge held a permanency hearing and took those issues under advisement.
¶ 3. This appeal by the parents is based upon the assumption that the adjudication of abuse and neglect with aggravating circumstances by the trial court was in error because:
I. THE STATE FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT D.O. SEXUALLY ABUSED T.O.
II. THE YOUTH COURT ACT IS UNCONSTITUTIONAL PURSUANT TO THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND CORRESPONDING SECTIONS OF THE MISSISSIPPI CONSTITUTION.
III. THE TRIAL JUDGE ERRED BY FINDING THAT AGGRAVATING CIRCUMSTANCES EXISTED.
Upon a thorough review of the record, we find no reversible error.

FACTS
¶ 4. Julia Wasvick is a social worker at Mississippi's Department of Health in Harrison County. Wasvick has known and counseled the parents since March of 1998, when D.O.'s wife, J.O., became pregnant with D.O., II. During that pregnancy, Wasvick enrolled J.O. in the Health Department's high risk program, due to her mental illness. She has been diagnosed as mildly mentally retarded with an estimated IQ of 66 complicated by her bi-polar personality disorder. T.O. was also found to be mildly mentally retarded, her IQ estimated at 57.
¶ 5. On August 19, 1999, the mother took the children to the Health Department to obtain lice medication for T.O. While waiting for the medication to arrive, the mother walked to Wasvick's office to "show off" D.O., II, to her former counselor. During *419 their visit, Wasvick inquired about the rest of the family. In response, J.O. told Wasvick that someone accused the father of abusing T.O. causing the family problems. Wasvick asked the mother if the allegations were true, and she confessed that they were, in fact, true. The mother further admitted that she had seen the father having sex with T.O., who was three years old at the time. J.O. mentioned that the abuse stopped for a while, but had recently begun again. J.O. then asked Wasvick not to repeat this information to anyone and hurriedly left her office.
¶ 6. Kari Mallory, an investigator from the DHS, testified that after receiving Wasvick's report, she went to the parents' home to remove the children from their custody. While Mallory was there, J.O. explained that the conversation Wasvick recounted in her report was the result of a simple misunderstanding. She told Mallory that she never admitted to Wasvick that her husband was abusing T.O., but rather Wasvick simply misunderstood what she said.
¶ 7. At trial, a report made by Mallory detailing her visit to the family's home was offered into evidence.[2] In this report, Mallory recorded what occurred when she arrived to pick up the children. She stated that the father pointed to T.O.'s unclothed genital area and asked if this was where he was supposed to be "finger f* * *ing" T.O. Throughout the course of their encounter, when D.O. referred to J.O., he simply called her "my bitch." Mallory further testified that the father told her that he'd "rather cut that off [his penis] than mess with [T.O.]," adding, "Now, if she were fifteen or sixteen, that would be different."
¶ 8. Mallory also noted that the house has only two bedrooms, leading to somewhat unusual sleeping arrangements. The father sleeps in the bed in the back bedroom, as it is the only air-conditioned room. J.O. sleeps on the floor on a pallet with the children in the back bedroom as well; D.O., II, does not have a crib. The children's paternal grandmother sleeps in the front bedroom, with T.O. occasionally sleeping with her. Both parents receive SSI benefits and are unemployed except for a lawn service they jointly operate. Mallory testified that neither the father nor the mother ever admitted sexually abusing the child. Mallory also believes that J.O. wants her children back and will do whatever is necessary to achieve that end.
¶ 9. Dr. Horrell Townsend, the expert witness appointed by the trial court, then took the stand. He was qualified and accepted, without objection, as an expert in obstetrics and gynecology. Dr. Townsend examined T.O. on September 8, 1999. Specifically, he anesthetized T.O. and performed a pelvic examination using a laparoscope to document his findings with photographs. As a result of the examination, Dr. Townsend found that T.O. had an abnormal relaxation of the opening of the anus and rectum. He testified that only two scenarios would cause such an abnormal opening; a self-inflicted anal intrusion or sexual abuse. Dr. Townsend further testified that it was extremely unlikely that T.O. did this to herself because of the extreme pain it would have caused. Among the hundreds of cases that Dr. Townsend had seen, he classified this one as "remarkable" due to the amount of dilation the anal opening exhibited. It was Dr. Townsend's expert medical opinion *420 that strong evidence of previous penetration of the anus and rectum existed based upon both the amount of anal dilation T.O. exhibited and the minimal anal traction found in her rectum.
¶ 10. During cross-examination, Dr. Townsend was given a report[3] written by Dr. Maria M. Moman to review. Laura Jones, a social worker, took T.O. to Dr. Moman on October 19, 1999, for a perianal examination because T.O. complained of "itching" in that area. Dr. Moman's report stated that there was inconclusive evidence of sexual abuse. When asked to reconcile these findings with his beliefs, Dr. Townsend pointed out that Dr. Moman's report was written forty-five days after his examination, without notation as to whether the child was anesthetized.[4] Dr. Townsend also pointed out that enough time may have elapsed between his examination and Dr. Moman's to allow T.O.'s body to heal, thus effectively erasing the physical abuse. Dr. Moman's report did note that when T.O. was asked if anyone touched her in her crotch area, she responded "Daddy."
¶ 11. Dr. Nurul Islam, a pediatrician, examined T.O. on August 17, 1999. Dr. Islam conducted an examination of her pelvic area and found no evidence of abuse. His examination was not as thorough as Dr. Townsend's because he found no indication of sexual abuse during the initial external exam that warranted a more in-depth procedure. After examining the photographs in evidence of Dr. Townsend's exam, Dr. Islam further testified that he could not conclude whether T.O. exhibited any significant anal dilation. Dr. Islam testified that Dr. Townsend's findings did not correlate with his findings, and he specifically disagreed with Dr. Townsend's conclusion that anal penetration occurred. Dr. Islam disagreed with this conclusion because, in his experience, evidence symptomatic of anal penetration in these cases "looked different" than what was portrayed in T.O.'s laparoscopic photographs. As a caveat, Dr. Islam testified that he usually transferred cases that dealt with the rectum or vagina to an expert. Additionally, the record reflects that his examination pre-dated the mother's visit to the Health Department by two days.
¶ 12. D.O. took the stand in his defense. He testified unequivocally that he never sexually abused his daughter. He believed that Wasvick misunderstood his wife due to her mental disability. The father testified he was rarely alone with T.O. because his wife or mother remained near to care for the child's immediate needs. When asked to explain T.O.'s condition, he testified that he was aware of a prescription enema previously placed in T.O.'s rectum, offering that as a potential cause. D.O. also testified that he had seen T.O. insert her fingers into her rectum. Both of these explanations were rejected as inadequate by medical experts as the cause of T.O.'s condition. D.O. stated that he had no idea how T.O.'s anal and rectal condition manifested itself. He also vehemently denied that he made any of the statements attributed to him by Mallory. The mother then *421 testified that she never accused D.O. of sexual abuse, writing the entire situation off as a mistake. She did admit telling Wasvick that DHS planned to investigate the alleged abuse.

STANDARD OF REVIEW
¶ 13. This Court's standard of review of Youth Court cases is limited. The trier of fact at a Youth Court hearing is the Youth Court judge. In re D.K.L., 652 So.2d 184, 188 (Miss.1995). When reviewing the evidence, we do not proceed de novo. Id. at 189. Rather, when the Youth Court makes an adjudication of neglect, this Court considers all the evidence considered by the Youth Court in the light most favorable to the State. Collins v. Lowndes County Pub. Welfare Dep't, 555 So.2d 71, 72 (Miss.1989). If the evidence so considered is opposed to the finding of the Youth Court with such force that reasonable men could not have found as the Youth Court did by a preponderance of the evidence, this Court must reverse. Id. at 72. However, if there is substantial evidence in the record supporting the adjudication of the Youth Court, evidence of such quality and weight that, even under the "beyond a reasonable doubt" standard, the Youth Court might reasonably have ruled as it did, we must affirm. In re M.R.L., 488 So.2d 788, 790-91 (Miss.1986).

LEGAL ANALYSIS

I. THE STATE FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT D.O. SEXUALLY ABUSED T.O.
¶ 14. The parents submit that the State failed to meet its burden of proof at trial, believing that the evidence considered by the trial court was insufficient to support its ultimate finding. Specifically, they argue that the proceeding below hinged upon J.O.'s alleged misinterpreted statements. The parents point out that J.O.'s incriminating statements to Wasvick must be viewed in light of her aforementioned fragile mental condition. They also cite Dr. Moman's report and the testimony offered by Dr. Islam contradicting Dr. Townsend's finding that T.O. was sexually abused. Additionally, the parents assert that all evidence relating to the mother's statements to Wasvick was based upon hearsay and should not have been considered at trial. No hearsay objection was made when these statements were proffered at trial, thus barring this argument on appeal. It is fundamental that a trial court will not be reversed for failing to grant relief that was not requested. Chase v. State, 645 So.2d 829, 846 (Miss. 1994); Taylor v. State, 754 So.2d 598, 606 (Miss.Ct.App.2000).
¶ 15. Procedural bar notwithstanding, the parents cite In re C.B., 574 So.2d 1369 (Miss.1990) as authority to support their hearsay exclusion argument. In that case, the evidence of abuse by the father consisted entirely of hearsay testimony through statements allegedly made by the child. We held that in order to admit the hearsay statements of the child, the trial court must determine whether or not the testimony falls within any of the hearsay exceptions enumerated in M.R.E. 803. Id. at 1371-72. The trial court admitted the statements "as evidence that they were made" but not under the hearsay rule. Further, the Court noted that if the lower court fails to make this determination, the case must necessarily be reversed and remanded for consideration of the testimony under M.R.E. 803 exceptions. Id. at 1372. That case is easily distinguishable from the case at bar. The central factual issue in In re C.B. was that the only evidence available to the trial court proving sexual abuse were the child's accusations. This Court was forced to reverse because, *422 without an accurate determination of the admissibility of those statements, there simply was no evidence of any sexual or physical abuse. Such is not the case here. The unadorned facts underlying this case astonish even the most seasoned veterans of our judicial process.
¶ 16. The trial court relied upon Aldridge v. State, 398 So.2d 1308 (Miss.1981) as support for its decision to declare the children abused and neglected, saying that the similarities between the cases were "striking." In Aldridge, the parents of an infant were convicted of felonious child abuse when the infant sustained fractures to the right ankle, left wrist and left forearm. In his ruling, Judge Ward quoted the following passage from Aldridge:
There is no fact or circumstance in evidence tending in any way to support any other reasonable explanation of these injuries except that they were inflicted by its parents. No other person is shown to have had the custody or care of the infant save its parents. To sustain a verdict based on circumstantial evidence it is not necessary that such evidence exclude every possible doubt or theoretical supposition in no way related to the facts or circumstances of the case. It is enough that such evidence exclude every reasonable hypothesis of innocence.
Id. at 1311.
¶ 17. Recognizing that Aldridge was a criminal case, the trial court applied this logic to the civil burden of proof. Here, as in Aldridge, no evidence was presented showing anyone had custody of T.O. save her parents. The parents verified this by testifying that no one cared for T.O. other than themselves. There is also substantial proof in the record that T.O. was subjected to abuse other than that specifically detailed in the statements J.O. made to Wasvick. Mallory offered other statements by D.O. as well as information regarding their living situation. Dr. Townsend testified that it was his expert medical opinion that T.O. had suffered trauma to her anus and rectum. The trier of fact chose to believe Dr. Townsend over Dr. Islam, and Mallory over the parents. Such is the charge of the fact finder. Clearly, sufficient evidence was present to support the trial court's finding.

II. THE YOUTH COURT ACT IS UNCONSTITUTIONAL PURSUANT TO THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND CORRESPONDING SECTIONS OF THE MISSISSIPPI CONSTITUTION.
¶ 18. The argument section of the parent's brief under this issue is extremely difficult to follow as it is largely incoherent. As best as can be determined, the parents allege that the "procedure" used by the trial court is unconstitutional according to both the Mississippi and United States Constitutions, calling it "arbitrary, capricious, and based upon a preponderance of the evidence." It seems the parents are arguing that a "clear and convincing evidence" standard should be applied rather than a "preponderance of the evidence" standard.
¶ 19. As support for their argument, the parents refer this Court to Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), where the parents appealed from a judgment of a family court which adjudged their children to be neglected. The Supreme Court held that before a state may sever completely and irrevocably the rights of parents in their natural child, due process requires that the state support its allegations by at least clear and convincing evidence, and therefore the "fair preponderance of the evidence" standard prescribed by the New York Family Court Act for the termination *423 of parental rights denied the parents due process.
¶ 20. The parents believe that because Judge Ward adjudicated the children abused and neglected, he effectively terminated their parental rights through that proceeding. This is, of course, an incorrect reading of the law. The proceeding below was not a parental rights termination case, but rather a disposition hearing to determine whether or not the children were abused and neglected. Neither this finding nor the later finding of the trial court that "aggravating circumstances" existed served as a termination of parental rights. It was simply a decision that allowed the Department of Human Services to avoid working with the parents through counseling and other channels toward reunification with the children. This is consistent with the statutory scheme outlined in the Youth Court Act. Miss. Code Ann. §§ 43-21-603 & -613 (2000).
¶ 21. The parents failed to raise the constitutionality of the statute at trial. This Court has held that although an issue is constitutional in nature, it is not absolved from the general rule that objections must be raised at the trial level. In re V.R., 725 So.2d 241, 245 (Miss.1998). See also Smith v. Fluor Corp., 514 So.2d 1227, 1232 (Miss.1987) (holding that the constitutionality of a statute will not be considered unless the point is specifically pleaded); Colburn v. State, 431 So.2d 1111, 1114 (Miss.1983) (determining that failure of defendant to raise a constitutionality question about an aggravated assault statute in a proper motion before the trial court is a constitutional waiver of any error and precluded defendant from seeking reversal on this ground on appeal). The parents had ample opportunity to argue this issue during any one of their numerous hearings, but failed to do so, barring the issue on appeal.
¶ 22. Serving as a second procedural bar, the parents failed to send notice of their challenge to the Attorney General, violating Rule 24(d) of the Mississippi Rules of Civil Procedure which requires that proper notice be given to the Attorney General when the constitutionality of a statute is challenged "to afford him an opportunity to intervene and argue the question of constitutionality." Pickens v. Donaldson, 748 So.2d 684, 691 (Miss.1999) (citing Miss. R. Civ. P. 24(d)). Rule 44(a) of the Mississippi Rules of Appellate Procedure similarly requires service of any appellate brief challenging the validity of a statute "on the Attorney General, the city attorney, or other chief legal officer of the governmental body involved." Pickens, 748 So.2d at 691 (citing M.R.A.P. 44(a)). "Except by special order of the court to which the case is assigned, in the absence of such notice neither the Supreme Court nor the Court of Appeals will decide the question until the notice and right to respond contemplated by this rule has been given to the appropriate governmental body." Id. at 691. The parents' failure to raise the issue of the constitutionality of a statute at trial or to notify the Attorney General's Office of their challenge of the statute results in the procedural bar on this issue. Id. at 691.
¶ 23. Procedural bars notwithstanding, the merits of the claim are as follows. This Court, in In re T.L.C., 566 So.2d 691 (Miss.1990), discussed the standard of review employed when considering the constitutionality of a statute:
Without doubt, our constitutional scheme contemplates the power of judicial review of legislative enactments; however, that power may be exercised affirmatively only where the legislation under review be found in the palpable conflict with some plain provision of the... Constitution. Statutes such as the *424 Youth Court Act come before us clothed with a heavy presumption of constitutional validity. The party challenging the constitutionality of a statute is burdened with carrying his case beyond all reasonable doubt before this Court has authority to hold the statute, in whole or in part, of no force or effect. When a party invokes our power of judicial review, it behooves us to recall that the challenged act has been passed by legislators and approved by a governor sworn the uphold the selfsame constitution as are we.
Id. at 696 (citations omitted). The parents have failed to make any showing that any of their fundamental constitutional rights have been violated, much less proving their allegation beyond all reasonable doubt. They simply complain that their rights were denied in an argument consuming less than three paragraphs on a single page in their brief. Therefore, this issue is both procedurally barred and meritless.

III. THE TRIAL JUDGE ERRED BY FINDING THAT AGGRAVATING CIRCUMSTANCES EXISTED.
¶ 24. The parents' final argument rests upon the trial judge's finding that "aggravating circumstances" existed. They contend that there "was nothing in the record which would have caused the lower court to declare the case at hand an aggravated case." Miss.Code Ann. § 43-21-603 (2000)[5] was followed to the letter by the trial judge. The record is replete with evidence supporting the Judge Ward's finding of abuse. The only cases cited by the parents, all from foreign jurisdictions, simply restate that "clear and convincing" evidence is required rather than a "preponderance of the evidence" to terminate parental rights. This argument is discussed thoroughly under Issue II. There is no merit to this re-framed allegation of error.

CONCLUSION
¶ 25. Because there was ample evidence presented at trial supporting the judge's ruling, and the parents' final two allegations of error are specious, we affirm the judgment of the Harrison County Youth Court.
¶ 26. AFFIRMED.
*425 PITTMAN, C.J., BANKS AND McRAE, P.JJ., SMITH, MILLS, WALLER, COBB AND EASLEY, JJ., CONCUR.
NOTES
[1] In E.S. v. State, 567 So.2d 848, 850 (Miss. 1989), the Harrison County Family Court found that M.S., J.S., and A.S., siblings of E.S., were neglected and abused minor children within the meaning of the Act because they lived in the house while E.S. suffered the abuse.
[2] The parents' attorney objected and the judge reserved ruling on it. While the trial judge's final ruling on this matter is not in the record, he said at the time that he would be inclined to let it in under M.R.E. 803(8).
[3] The report is little more than an illegibly handwritten paragraph. It is, to say the least, not a comprehensive review of T.O.'s condition and appears to address only external genital and anal areas.
[4] Dr. Townsend testified that this distinction makes a significant difference. Dr. Townsend explained that anyone who is examined rectally while awake will have a normal or tighter than normal anal sphincter tone because of the tense nature of the exam. He further testified that the anesthesia did not affect T.O.'s muscle tone, causing it to relax more than normal during her examination, because the sphincter muscle is not affected by general anesthesia.
[5] Section 43-21-603 reads in pertinent part:

(6) After consideration of all the evidence and the relevant factors, the youth court shall enter a disposition order which shall not recite any of the facts or circumstances upon which such disposition is based, nor shall it recite that a child has been found guilty; but it shall recite that a child is found to be a delinquent child, a child in need of supervision, a neglected child or an abused child.
(7) In the event that the youth court orders that the custody or supervision of a child who has been adjudicated abused or neglected be placed with the Department of Human Services or any other person or public or private agency, other than the child's parent, guardian or custodian, the youth court shall find and the disposition order shall recite that:
(a)(i) Reasonable efforts have been made to maintain the child within his own home, but that the circumstances warrant his removal and there is no reasonable alternative to custody; or
(ii) The circumstances are of such an emergency nature that no reasonable efforts have been made to maintain the child within his own home, and that there is no reasonable alternative to custody; and
(b) That the effect of the continuation of the child's residence within his own home would be contrary to the welfare of the child and that the placement of the child in foster care is in the best interests of the child; or
(c) Reasonable efforts to maintain the child within his home shall not be required if the court determines that:
(i) The parent has subjected the child to aggravated circumstances including, but not limited to, abandonment, torture, chronic abuse and sexual abuse....